Frederick B. LAVERPOOL, Sr., Andrew Wilder, Jr., Percy Jackson, Lamont Gill, Keldric C. Browne, Jr., and Alton Jones, Plaintiffs,

v.

NEW YORK CITY TRANSIT AUTHORITY and Robert F. Kiley, individually as in his official capacity as Chairman of the Metropolitan Transit Authority, Defendants.

No. CV 90–2327 (ADS).

United States District Court, E.D. New York.

Oct. 31, 1993.

---

Frederick B. Laverpool, Sr., pro se.

Edmonds, Torres, Martinez & Mazza, New York City (Anthony Mazza, of counsel), for plaintiffs Wilder, Jackson, Gill and Jones.

Keldric C. Browne, Jr., pro se.

Albert C. Cosenza, Gen. Counsel for New York City Transit Authority, Brooklyn, NY (Evelyn Jonas, Edward F. Zagajeski, of counsel), for defendants.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

The plaintiffs rested their case on October 18, 1993, with the exception of certain exhibits, namely a Department of Transportation Report and a summary of the information contained in the Transit Authority drug test computer printout (Plaintiff's Exhibit 10). The defendants New York City Transit Authority ("Transit Authority") and Robert F. Kiley move, pursuant to Fed.R.Civ.P. 50(a), for a judgment as a matter of law dismissing the case.

On October 19–20, 1993, the Court rendered its decision on the motion for judgment as a matter of law from the bench. The following constitutes a written memorial-ization of that decision. The full decision of the Court consists of the transcript of the oral recitation, together with this written memorialization.

## BACKGROUND

The original complaint in this action was filed on or about July 6, 1990. The plaintiffs were originally represented by C. Vernon Mason, Esq. who was relieved as plaintiffs' counsel on or about June 13, 1991. A second amended complaint was filed on or about July 13, 1991 by the plaintiffs, who were, at that time, appearing pro se. The second amended complaint alleges that the defendants implemented a drug testing policy that caused the Transit Authority to deprive them of their civil rights by discharging them for testing positively on drug tests (Second Amended Complaint, at ¶¶ 2–7). On October 9, 1992 the Court denied the plaintiffs motion for class action certification.

Presently four of the plaintiffs, Wilder, Jackson, Jones, and Gill, are represented by counsel, Anthony Mazza, Esq. The plaintiffs Laverpool and Browne are proceeding *pro se.*

Since the plaintiff Browne had neither appeared at this trial, nor presented any evidence as of October 18, 1993, the Court granted the motion by the defendants to dismiss the action of the plaintiff Keldric Browne for the failure to prosecute (*See Minnette v. Time Warner,* 997 F.2d 1023, 1027 [2d Cir.1993] [addressing dismissal for failure to prosecute] ) and for failure to prove a prima facie case as to any cause of action.

On October 19, 1993, the plaintiff Browne appeared at the trial and requested that the Court vacate the default and permit him to present evidence at the trial. At this point, the Court suspended its oral recitation of the decision on the motion for judgment as a matter of law. Thereafter, Court granted the application of the plaintiff Browne to vacate his default and on October 20, 1993 Browne testified before the jury. After Browne's testimony, the Court took a recess and then rendered its oral decision on the motion for judgment as a matter of law.

In this analysis of the defendants' motion for a judgment as a matter of law as to the

plaintiffs, Laverpool, Wilder, Jackson, Gill, Jones, and Browne, the Court will review the claims asserted by each of the six plaintiffs. The second amended complaint sets forth the following seven federal causes of action, in addition to pendent state law claims: (1) Section 1983 claim and state law claims for the deprivation of his job without procedural due process of law; (2) Section 1983 claim for an unreasonable search and seizure due to the drug testing procedures; (3) Section 1983 claim based on equal protection violations; (4) Section 1985 Civil Rights Conspiracy; (5) Civil RICO; (6) Title VII of the Civil Rights Act of 1964; and (7) Rehabilitation Act of 1973.

### Section 1983 and 1985 Claims

The plaintiffs Laverpool, Wilder, Jackson, Gill, Browne, and Jones originally asserted three claims for Section 1983 violations: (1) Deprivation of their jobs without procedural due process of law; (2) Unreasonable search and seizure due to the drug testing procedures; (3) Equal protection violations. Additionally, these plaintiffs originally asserted claims under 42 U.S.C. § 1985, the civil rights conspiracy statute.

On April 30, 1993, the Court granted the defendants' motion for summary judgment dismissing all the Section 1983 and Section 1985 claims of the plaintiffs Gill and Jones based upon the defense of the statute of limitations. Additionally, on October 19, 1993, counsel for the plaintiffs Wilder, Jackson, Gill, and Jones stated on the record that their Section 1985 cause of action was withdrawn.

Accordingly, only the plaintiffs Laverpool, Wilder, Jackson, and Browne have a Section 1983 cause of action, and only the plaintiffs Laverpool and Browne have a Section 1985 cause of action.

### Civil RICO

The plaintiffs Laverpool, Wilder, Jackson, Gill, Browne, and Jones originally asserted a claim under the Civil RICO statute. On October 18, 1993, counsel for the plaintiffs Wilder, Jackson, Jones, and Gill informed the Court that the claims asserted by these plaintiffs under the Civil RICO statute are withdrawn. Accordingly, the only plaintiffs who are still asserting a cause of action under Civil RICO are Laverpool and Browne.

### Title VII of the Civil Rights Act

The plaintiffs Laverpool, Wilder, Jackson, Gill, Browne, and Jones originally asserted a claim under Title VII of the Civil Rights Act of 1964. On October 18, 1993, counsel for the plaintiffs Wilder, Jackson, Jones, and Gill informed the Court that the claims asserted by these plaintiffs under Title VII of the Civil Rights Act of 1964 are withdrawn. Accordingly, the only plaintiffs who are still asserting a cause of action under Title VII of the Civil Rights Act of 1964 are the plaintiffs Laverpool and Browne.

### Rehabilitation Act

The plaintiffs Laverpool, Wilder, Jackson, Gill, Browne, and Jones originally asserted a claim under the Rehabilitation Act of 1973. On October 18, 1993, counsel for the plaintiffs Wilder, Jackson, Jones, and Gill informed the Court that the claims asserted by these plaintiffs under the Rehabilitation Act of 1973 are withdrawn.

In addition, the Court notes that the claims of the plaintiffs Jones and Gill under this statute are barred by the statute of limitations. The Rehabilitation Act of 1973 is governed by the state statute of limitations for personal injury actions (*see Morse v. University of Vermont*, 973 F.2d 122, 127 [2d Cir.1992]) which is three years in New York (*See* N.Y.C.P.L.R. 214[5]). The claim of plaintiff Jones accrued on September 9, 1985, the date his employment application was rejected, and the claim of plaintiff Gill accrued on May 15, 1986, the date he was dismissed as a result of the positive drug test. Since both of these dates are more than three years prior to June 6, 1990, the date this action was commenced, the claims of Jones and Gill are barred by the statute of limitations.

Additionally, the plaintiff Laverpool stated, in open Court, that he is not seeking relief pursuant to this statute. Therefore, the only

plaintiff with this cause of action is the plaintiff Browne.

The Court will now address the claims asserted by the remaining plaintiffs, as to the remaining causes of action.

### 1. Frederick B. Laverpool, Sr.:

The plaintiff Frederick Laverpool ("Laverpool"), was a Special Inspector with the Transit Authority and a former president of the Special Inspector's Benevolent Association. During his time as union president he "began an investigation, questioning irregularities and inconsistencies" in the Transit Authority's drug testing policies (Second Amended Complaint, at ¶ 204). Laverpool was tested for drugs on May 4, 1988 and was informed that his test was positive on May 8, 1988. Laverpool was dismissed on June 9, 1988. The second amended complaint alleges a scheme in which the Transit Authority drug tested Laverpool in an attempt to get rid of him. This "scheme" was furthered by the allegation that the Transit Authority "bribed" the arbitrator of the employment disputes by offering him an "$80,000 per annum job" (Second Amended Complaint, at ¶ 211).

### 2. Andrew Wilder, Jr.:

The second amended complaint alleges that the plaintiff Andrew Wilder, Jr. ("Wilder") was involved in a passenger-train incident on June 25, 1987 and based upon this incident was required to submit to a drug test (Second Amended Complaint, at ¶¶ 218–19). There is the further allegation that the Train Operator, who was a white male, was not given a drug test, but Wilder, who is black was tested and the test was positive (Second Amended Complaint, at ¶ 220). Wilder was then assigned to another job, as a Mail Clerk, and was directed on or about January 5, 1988 to submit to another drug test in which Wilder tested positive (Second Amended Complaint, at ¶¶ 223–24). Wilder was discharged on January 18, 1988 (Second Amended Complaint, at ¶¶ 225).

### 3. Percy Jackson:

The second amended complaint alleges that the plaintiff Percy Jackson ("Jackson") began his employment with the Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA") in 1978 as a bus driver (Second Amended Complaint, at ¶ 230). On or about March 25, 1988, he was required to submit to a drug test during his annual physical examination (Second Amended Complaint, at ¶ 231). He tested positive and because he feared losing his job participated in the Employee Assistance Program ("EAP") (Second Amended Complaint, at ¶¶ 235–36). There is the allegation that he submitted to thirty (30) tests, while in the EAP program, and all were negative. He returned to work and pursuant to the requirement for testing employees returning to the job, submitted to a drug test on October 14, 1988, and tested positive (Second Amended Complaint, at ¶ 237). When he challenged his dismissal because of the positive result he determined that his specimen did not bear his "affixed signature or initials" which he alleges were placed on his original specimen (Second Amended Complaint, at ¶ 238), but this did not prevent his dismissal.

### 4. Lamont Gill:

In the second amended complaint, the plaintiff Lamont Gill ("Gill") alleges that he was absent from work due to an extended hospitalization and that he was required to submit to a "return to work" physical examination on March 17, 1986. This examination included a drug test. On April 1, 1986, Gill was suspended, pending dismissal, as a result of testing positive for a controlled substance. On May 15, 1986 a "tripartite arbitration hearing" was held, over Gill's objection that he had inadequate representation (Second Amended Complaint, at ¶ 251). Although the June 2, 1986 decision of the arbitration panel recommended reinstatement, the Transit Authority dismissed the plaintiff Gill on June 9, 1986 (Second Amended Complaint, at ¶ 253).

### 5. Alton Jones:

The plaintiff Alton Jones ("Jones") is not an employee of the Transit Authority and is suing because certain allegedly discriminatory practices deprived him of the opportunity of obtaining a job with the Transit Authority. Jones alleges that on or about September 9,

1985 his employment application was rejected due to an allegedly positive test of his urine sample (Second Amended Complaint, at ¶ 289). Jones filed numerous appeals of his rejected application, however the determination to reject his application was sustained. This plaintiff attempted to challenge his medical disqualification, but he was denied such an appeal (Second Amended Complaint, at ¶ 291).

### 6. Keldric C. Browne, Jr.:

The plaintiff Keldric Browne, Jr. ("Browne") was employed by the transit authority as a bus operator. The second amended complaint alleges that during November 1988, Browne voluntarily entered the transit authority's EAP program. When Browne returned to work on or about March 3, 1989, he was required to submit to a drug test and the result was negative (Second Amended Complaint, at ¶ 262).

Thereafter, Browne resumed his duties as a bus operator and was tested for drugs on or about April 6, 1989. On April 12, 1989 he was informed that he had tested positive for a controlled substance and was suspended, pending dismissal (Second Amended Complaint, at ¶¶ 263–64). Browne then reentered the EAP program and after not testing positive during the program he was allegedly informed that he was ineligible for reinstatement (Second Amended Complaint, at ¶¶ 271–72). It is alleged that Browne was discharged in violation of the Rehabilitation Act of 1973 (Second Amended Complaint, at ¶ 272).

### DISCUSSION

#### Motion for a Judgment as a Matter of Law:

A motion for a judgment as a matter of law, formerly known as a judgment notwithstanding the verdict, is governed by Rule 50(a) of the Federal Rules of Civil Procedure which states, in relevant part, that:

"[i]f during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue" (Fed.R.Civ.P. 50[a][1] ).

In explaining this standard, the Second Circuit has recently reiterated that:

"the district court may grant the motion 'only when, viewing the evidence most favorably to the party other than the movant, "there can be but one conclusion as to the verdict that reasonable men could have reached." ' Diebold v. Moore McCormack Bulk Transp. Lines, Inc., 805 F.2d 55, 57 (2d Cir.1986) (quoting Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163, 167 (2d Cir.1980)). The nonmovant must be given the benefit of all reasonable inferences, because the trial court 'cannot assess the weight of the conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury.' Mattivi, 618 F.2d at 167. (Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 59–60 [2d Cir.1993]; see also Kreppein v. Celotex Corp., 969 F.2d 1424, 1426 [2d Cir.1992]; Michelman v. Clark–Schwebel Fiber Glass Corp., 534 F.2d 1036, 1042 [2d Cir.], cert. denied, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 [1976] ).

A federal district court should grant a motion for a judgment as a matter of law, after a jury returns with a verdict, only when

"the movant's evidence is so overwhelming that a reasonable jury could only have reached the opposite result, Baskin v. Hawley, 807 F.2d 1120, 1129 (2d Cir.1986) or ' "such a complete absence of evidence support[s] the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," ' Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 132 (2d Cir.1986) (quoting Mallis v. Bankers Trust Co., 717 F.2d 683, 688–89 (2d Cir.1983)). A less stringent standard would risk impermissibly substituting our view of the evidence for that of the jury" (County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1311 [2d Cir.1990] ).

This Court is also mindful that "[t]he jury's role as the finder of fact does not entitle it to

return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial" (*Michelman, supra*, 534 F.2d at p. 1042). When there is the complete absence of evidence to support any finding by the jury in favor of the plaintiffs, then the Court must grant a judgment as a matter of law at the conclusion of the plaintiffs' case since there is no issue of fact to submit for the jury's determination (*Weldy, supra*, 985 F.2d at pp. 59–60).

It is based upon these legal principles that the Court examines the defendants' motion for a judgment as a matter of law at the conclusion of the plaintiffs' case. In doing so, the Court will address each of the claims asserted by the plaintiffs.

### Claims Asserted by Plaintiff Jackson:

 The plaintiff Jackson testified that he was a former employee of the MaBSTOA and was terminated from his employment in September or October, 1988. On cross examination he stated that he never worked for the New York City Transit Authority. Notwithstanding the many common areas of employment and office facilities between the New York City Transit Authority and MaBSTOA, it is clearly established law that MaBSTOA and the Transit Authority "are separate entities" (*Reis v. Manhattan and Bronx Surface Transit Operating Authority*, 161 A.D.2d 288, 555 N.Y.S.2d 61, 62 [1st Dep't], *appeal denied*, 76 N.Y.2d 707, 561 N.E.2d 889, 560 N.Y.S.2d 989 [1990] ). Further, it has been held that the Transit Authority and MaBSTOA are not "united in interest" and service of a notice of claim and complaint upon one entity does not constitute service on the other entity (*See Zaiman v. Metropolitan Transit Authority*, 186 A.D.2d 555, 588 N.Y.S.2d 402, 404 [2d Dep't 1992] [*citing Adams v. New York City Transit Authority*, 140 A.D.2d 572, 573, 528 N.Y.S.2d 638 [2d Dep't 1988]; *Reis, supra*, 555 N.Y.S.2d at p. 62] ).

Accordingly, since the plaintiff Jackson was not an employee of the Transit Authority, was not dismissed by the Transit Authority, and has not introduced any evidence to demonstrate that he was injured as a result of the actions of the defendants Transit Authority or Kiley, the defendants' motion for a judgment as a matter of law dismissing his federal and state claims is granted.

### State Law Claims:

According to the Public Authorities Law, "[a]n action against the [Transit Authority] founded on tort shall not be commenced more than one year and ninety days after the happening of the event upon which the claim is based, nor unless a notice of claim shall have been served on the authority within the time limited, and in compliance with all the requirements of section fifty-e of the general municipal law" (N.Y.Pub.Auth.Law § 1212[2] ). The plaintiffs cannot proceed in this lawsuit as to any defendant, on any state cause of action, unless they first served a notice of claim within ninety days of the incident and second, commenced an action within one year and ninety days. In the present case none of the plaintiffs submitted evidence that they served a notice of claim on the defendants and all of the supplemental state law claims sound in a tortious nature.

 This morning, at approximately 9:30 AM our chambers received a telephone call from Mr. Laverpool indicating that he has the notice of claim for his state court claims. For the purpose of making a ruling on this Rule 50 motion, the Court will presume that Mr. Laverpool did serve a notice of claim within ninety days from his discharge on June 9, 1988. However, this action was commenced on July 6, 1990, more than one year and ninety days from the date of his discharge and accordingly the supplemental state law claims are time barred.

Therefore, the motion for judgment as a matter of law dismissing all New York State law claims is granted as to all plaintiffs, except the plaintiff Laverpool, for the failure to serve a notice of claim and as to all of the plaintiffs, except Browne, for the failure to commence an action within one year and ninety days.

Since the plaintiffs Gill and Jones only had supplemental state claims remaining, the motion to dismiss the complaint with regard to all causes of action of plaintiffs Gill and Jones is granted. After the above determinations, the remaining plaintiffs for consideration are

Laverpool, Wilder, and Browne. However, to complete the record, the Court will also address the merits of the remaining claims by the plaintiff Jackson for Section 1983 violations.

### Section 1983 Claims:

■ Section 1983 states, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress" (42 U.S.C. § 1983). A violation of this statute is proven when "a person or persons acting under color of state law deprived a plaintiff of rights, privileges, or immunities secured by the constitution or laws of the United States (*McDarby v. Dinkins,* 907 F.2d 1334, 1336 [2d Cir.1990] [*citing Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 [1981] ).

The plaintiffs Laverpool, Wilder, Browne, and Jackson assert that the defendant Transit Authority violated Section 1983 by: (1) depriving the plaintiffs of their jobs without procedural due process of law; (2) improperly drug testing the plaintiffs in violation of their Fourth Amendment search and seizure rights; and (3) depriving the plaintiffs of equal protection under the law. The Court will address each of these claims individually.

### (1) Section 1983 Procedural Due Process:

■ The Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 [1976], set forth the criteria to be used by a Court in determining whether an administrative procedure comports with the procedural requirements of the due process clause. In *Mathews* the Supreme Court stated that the Court should consider:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including

the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail" (*Mathews, supra,* 424 U.S. at p. 335, 96 S.Ct. at 903; *see also Patchogue Nursing Center v. Bowen,* 797 F.2d 1137, 1145 [2d Cir.1986], *cert. denied,* 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 [1987] [discussing medicare participation] ).

In examining a claimed deprivation of property without due process of law, the Court must ask two questions: (1) Were the plaintiffs deprived of a property interest; and (2) What process is due? (*See Kraebel v. New York City Department of Housing Preservation and Development,* 959 F.2d 395, 404 [2d Cir.], *cert. denied,* —— U.S. ——, 113 S.Ct. 326, 121 L.Ed.2d 245 [1992] ).

The plaintiffs Laverpool, Wilder, and Browne established that they were entitled to civil service job protection as civil service employees (*See* N.Y.Pub.Auth.Law § 1210). The plaintiff Jackson, as an employee of MaBSTOA, is not covered by the civil service law, and thus does not have a property interest in his job (*See Collins v. Manhattan & Bronx Surface Transit Operating Authority,* 62 N.Y.2d 361, 465 N.E.2d 811, 812–15, 477 N.Y.S.2d 91, 92–95 [1984] ). However, even if the Court presumes, for the purpose of this motion, that all of these plaintiffs have a "property" interest in their jobs, the question then becomes "What process is due?" The Court will address the procedures employed in discharging each plaintiff.

#### Laverpool

In the present case, the plaintiff Laverpool testified that in 1987 he became ill for five (5) months due to a heart condition. Upon his return to his job as a Special Inspector he was told that he had to take a mandatory drug test on May 4, 1988. On May 8, 1988 Mr. Laverpool was advised that his urine specimen had tested positive for a controlled substance. Thereafter, the plaintiff Laverpool went through all three steps of the grievance procedure prior to his being terminated for the drug test.

Mr. Laverpool believed that the arbitrator involved in his initial grievance process, Robert T. Simmelkjaer, was biased due to the

Transit Authority having offered him a job as a "hearing officer" during the time between the hearing and the award. He then challenged the arbitration award in the New York State Supreme Court. In a Decision, dated October 20, 1989, Justice Hutcherson of the New York State Supreme Court, Kings County, vacated Robert Simmelkjaer's arbitration award adjudicating the Laverpool matter, based on the conflict of interest, and a new hearing was ordered before another arbitrator.

Thereafter, a second arbitration hearing was scheduled for April 21, 1991 before Arbitrator Martha Cooper, who was selected by the American Arbitration Association. Mr. Laverpool conceded, in his testimony, that he did not appear for this arbitration hearing. In fact, a letter from the plaintiff Laverpool to the American Arbitration Association, dated April 20, 1991 (Defendant's Exhibit B), stated that Laverpool would not participate in the arbitration.

■■■ According to the Second Circuit, in a recent opinion, "[d]ue process requires, as a general matter, an 'opportunity to be heard "at a meaningful time and in a meaningful manner"'" (*Calhoun v. New York State Div. of Parole Officers*, 999 F.2d 647, 653 [2d Cir.1993]). In the present case, with respect to the plaintiff Laverpool, the Court finds that Mr. Laverpool was provided with numerous opportunities to review the merits of his termination. First, he exhausted the three step procedure available to him by the Transit Authority and the collective bargaining agreement. Second, he appeared before Arbitrator Simmelkjaer. Third, he had Simmelkjaer's award vacated in an action commenced in New York State Court. Fourth, he was afforded the opportunity to arbitrate the matter before Arbitrator Martha Cooper on April 21, 1991 and by his written letter dated April 21, 1991 and his actions, failed to appear at this opportunity to review the merits of his discharge. He therefore abandoned his appeal and waived his right to challenge the dismissal.

The Court finds, as a matter of law, that the plaintiff Laverpool failed to establish that he was denied the opportunity to be heard at a meaningful time and in a meaningful man-

ner. There is no evidence submitted by Laverpool that he was deprived of any due process. On the contrary, the evidence is clear that he was afforded the most meaningful due process, under the circumstances of his employment (*See Calhoun, supra*, 999 F.2d at p. 653).

Accordingly, the motion by the defendants for a judgment as a matter of law dismissing his procedural due process claims under both Section 1983 and New York state law is granted.

## Wilder

The plaintiff Wilder asserts that on June 25, 1987 he was involved in an incident in which a passenger was injured while reaching through the window of the train car in which Wilder was located as it was leaving the station platform. Mr. Wilder testified that he was the person who pulled the emergency cord on the train which stopped the train.

The plaintiff Wilder was subjected to a drug test as a result of this incident, although he asserts that the train operator was not tested. Wilder was informed, thereafter, that he had tested positive for marijuana. Nevertheless, he returned to work on the same train and worked three more months as a conductor. Then during September 1987, although he maintained his job title as a "conductor", by a "pick" he chose to work in a mail clerk's job. On or about January 8, 1988 he was subjected to a second drug test. He was informed on or about January 18, 1988 that he was being dismissed. Wilder testified that he went to a step one hearing together with his union representative. He was informed that since this was his second positive test, he was being terminated.

■■■ Further, Wilder testified that he was informed about his right to appeal this determination of his termination and states that he requested a step two hearing, but never received it, despite his apparent request. The Transit Authority, during its cross-examination, established that the plaintiff Wilder was represented by a union representative at all disciplinary hearings. Further, the Transit Authority introduced evidence (Defendants' Exhibit AG) which is a March 7,

1988 letter from the Transit Authority to Mr. Andrew Wilder. This letter states, in full:

"Dear Mr. Wilder:

Pursuant to the Contractual Disciplinary Procedure, the Step II Meeting resulting from the appeal of the Disciplinary Notification dated, January 19, 1988, that you be dismissed from the service has been rescheduled for 9:00 A.M. on March 17, 1988, at 370 Jay Street, Brooklyn, New York 11201, Room 308.

*Your failure to appear for the Step II Meeting as scheduled, will be deemed to constitute an abandonment of the appeal and the above mentioned discipline shall be implemented.*

Very truly yours,
Stanley M. Stern
Hearing Officer
Labor Relations, RTO"

This letter was sent to the plaintiff Andrew Wilder at the address, "410 Eastern Parkway Apt. # 6C, Brooklyn, NY 11233" by Certified Mail, Return Receipt Requested. In response to questioning by the Court, the plaintiff Wilder testified that this is his correct address. The envelope which was admitted as part of Defendants' Exhibit AG, in evidence, indicates that the postal service attempted delivery on three occasions: March 14, 1988, March 19, 1988, and March 29, 1988. The letter was ultimately returned to the Transit Authority with the marking "Return to Sender—Unclaimed". The plaintiff Wilder did nothing further to obtain a Step II Meeting.

The Court finds, as a matter of law, that the plaintiff Wilder failed to establish that he was denied the opportunity to be heard at a meaningful time and in a meaningful manner. There was no evidence presented that Wilder was deprived of any due process. On the contrary, the evidence is clear that he, just like the plaintiff Laverpool, was afforded meaningful due process, under the circumstances of his employment (*See Calhoun, supra,* 999 F.2d at p. 653).

### Jackson

The plaintiff Jackson testified that when he arrived at his job, shortly after his drug test, he was informed to go to the Union Office. In that office he was informed that he tested positive for cocaine. He was informed that he was required to go into a drug program in order to get his job back. Jackson testified that he was not offered the opportunity to consult with counsel, but rather informed that he had to go into the drug program.

The next week, Jackson was informed that he would be able to have a confirmation test conducted on the second bottle, but would still have to start the drug program at Day Top. Jackson did nothing to dispute this initial finding. After concluding the Day Top drug program, Jackson returned to work. On or about October 25, 1988, Jackson was retested. Approximately one and a half weeks later, Jackson was informed that he tested positive and was suspended.

When Jackson attempted to find out about obtaining a confirmation test, he was informed about three laboratories, however the second bottle was never tested because his signature did not appear on the label. Jackson stated that the second bottle was not his and it would be a waste of money to proceed with the second test.

Jackson went to an arbitration hearing before Arbitrator John Zuccotti. According to Jackson, there was supposed to be a second hearing, however he was not informed about the date and does not know the outcome. The Court finds, as a matter of law, that the plaintiff Jackson failed to establish that he was denied the opportunity to be heard at a meaningful time and in a meaningful manner. There was no evidence presented that Jackson was deprived of any due process. On the contrary, the evidence is clear that he, just like the plaintiffs Laverpool and Wilder, was afforded meaningful due process, under the circumstances of his employment (*See Calhoun, supra,* 999 F.2d at p. 653).

### Browne

The plaintiff Browne testified that on September 10, 1987 he was given a thirty day suspension based upon the fact that he almost had an accident while driving a Transit Authority bus. On September 7, 1988, Browne entered into a settlement agreement

with the Transit Authority, which stated, in relevant part, that:

"(1) The Authority will reduce the dismissal of Keldric Browne, Pass Number 108062 to a 30 day suspension and final warning. His reinstatement to employment will be without back pay.

\* \* \* \* \* \*

(3) The Grievant shall fully comply with Employees Assistance Program. His failure to do so shall permit the Authority to discharge him.

(4) The Authority may terminate Mr. Browne pursuant to 2 and 3 above at its discretion. Said discharge shall not be Arbitrable" (Settlement Agreement, dated Sept. 7, 1988).

Browne testified that he was having problems at work due to personal problems and that he went into the EAP program for some assistance. He further asserts that his suspension in 1987 was not drug related.

Thereafter, Browne testified that on or about April 7, 1989, he was informed that a drug test he had taken approximately one week previously was positive. He stated that he was given the opportunity to have the second bottle of urine tested for the presence of cocaine, however it would cost $79.00 to conduct the test. Browne was unable to afford the $79.00 to take the test, and therefore had to go back to the EAP program. The positive test result was on April 7, 1989.

Browne testified that after he had attempted to get a "bed" in the rehabilitation program for six months, he refused to continue to attempt to go into the J–Top Program and instead was tested by Project Create in Manhattan, a private drug rehabilitation program. Browne testified that he never formally enrolled in Project Create, but rather was just tested in that facility. Since Browne failed to complete a drug rehabilitation program, his employment with the Transit Authority was terminated.

██ In a letter, dated May 4, 1990 (Defendant's Exhibit BB), the plaintiff Browne was notified that:

"Our records indicate that one year has elapsed since your dismissal pursuant to

contract appendix EH–1 and policy instruction 6.0.2, (Drugs and controlled substance). Pursuant to said contract and policy, you are required to successfully complete Employee Assistance Program, no later than one year following your dismissal.

This is to advise you that you are no longer eligible for services under the authority of EAP as of April 6, 1990. Accordingly, your dismissal on April 6, 1989 will be implemented without any further right to restoration. The effective date of your termination will be April 6, 1989."

Mr. Browne did not testify about any denial of a hearing to review his termination, or that he exercised any of his rights to arbitrate his termination.

The Court finds, as a matter of law, that the plaintiff Browne failed to establish that he was denied the opportunity to be heard at a meaningful time and in a meaningful manner. In fact, Browne unlike any of the other plaintiffs had entered into a separate agreement with the Transit Authority which permitted the Transit Authority to terminate his employment if he failed to comply with the terms of the agreement. Browne was afforded meaningful due process, under the circumstances of his employment (*See Calhoun, supra,* 999 F.2d at p. 653).

Accordingly, the motion by the defendants for a judgment as a matter of law dismissing his procedural due process claims under both Section 1983 and New York state law is granted.

*(2) Section 1983 Search and Seizure*

██ The testing of urine for drugs, is deemed a Fourth Amendment search and must therefore be reasonable (*See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 616–18, 109 S.Ct. 1402, 1412–14, 103 L.Ed.2d 639 [1989] ). According to the Supreme Court, "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the partic-

ular context" (*National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665–66, 109 S.Ct. 1384, 1390–91, 103 L.Ed.2d 685 [1989] [*citing Skinner, supra*, 489 U.S. at pp. 619–20, 109 S.Ct. at 1414–15] ).

In *Skinner*, the Supreme Court stated that "[t]he Government's interest in regulating the conduct of railroad employees to ensure safety … '[present special needs] beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements'" (*Skinner, supra*, 489 U.S. at p. 620, 109 S.Ct. at p. 1415). The Federal Railroad Administration's urine testing regulations, were based upon the "governmental interest in ensuring the safety of the traveling public and of the employees themselves" and this "plainly justifies prohibiting covered employees from using alcohol or drugs on duty, or while subject to being called for duty. This interest also 'require[s] and justif[ies] the exercise of supervision to assure that the restrictions are in fact observed'" (*Skinner, supra*, 489 U.S. at p. 621, 109 S.Ct. at p. 1415 [*quoting Griffin v. Wisconsin*, 483 U.S. 868, 875, 107 S.Ct. 3164, 3169, 97 L.Ed.2d 709 (1987) ] ).

■ Those people deemed to have "safety sensitive" positions, who would be subject to the drug testing, "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences" (*Skinner, supra*, 489 U.S. at p. 628, 109 S.Ct. at p. 1419).

In applying the *Skinner* analysis to the drug testing policy with regard to employees of the Transit Authority, in *Burka v. New York City Transit Authority*, 739 F.Supp. 814 [S.D.N.Y.1990], Judge Patterson in the Southern District of New York held that the Transit Authority "possesses a 'special need' to take urine from those employees in safety sensitive positions … This 'special need' outweighs the private interests in having the protection of a warrant" (*Burka, supra*, 739 F.Supp. at p. 826). Judge Patterson determined that the following Transit Authority jobs would be safety-sensitive:

1) *Train Operators*—Inattentiveness can result directly in harm to either the public or other workmen.
2) *Bus Operators*—Same
3) *Tower Operators*—Same
4) *Train Conductor*—Same
5) *Conductor–Flagman*—Same
6) *Booth Clerks*—Responsible for reporting all emergency situations to the TA command center, including if a person falls onto the tracks.
7) *Cleaners*—Perform duties of booth clerks during the clerk's breaks.
8) *Collection Agents*—They carry firearms and must be prepared to make life or death decisions.
9) *Road Car Inspector*—Responsible for spot decisions about emergency repairs on trains which are in service and filled with passengers.
10) *Track Walker*—Inspects for defects on tracks and there are only "spot inspections" by a supervisor. The ability to make an accurate track condition report is critical.
11) *Track Equipment Maintainers*—Mechanics who repair various tools used by the track maintenance department. They are not closely supervised and the equipment they repair are dangerous pieces of equipment (chain saws).
12) *Chauffeur Specialist and Crane Operator*—Often drive "cranes, cherry pickers, bull dozers, and tractor trailers" at street level and in the presence of others.
13) *Signals Department*—The proper operation of the train signals is very important.
14) *Surface Department—Quality Control Dispatcher*—Checks whether certain essential features of the bus is operating properly.

(See *Burka, supra*, 739 F.Supp. at pp. 821–26).

The Court will first address whether the Transit Authority was permitted to require the drug tests on the plaintiffs Laverpool, Wilder, Browne, and Jackson. Then, the Court will address the allegations concerning the accuracy of the testing procedures.

### Ability to Drug Test Plaintiffs:

With respect to the plaintiff Laverpool, the testimony demonstrates that he was employed as a "Special Inspector". Mr. Laverpool testified that: (1) some special inspectors receive weapons training, (2) they investigate theft of services by employees, (3) he once received a commendation for saving a police officer's life, (4) the special inspectors were later in uniform; (5) the duties include the prevention of fare abuse, and (6) they drive Transit Authority vehicles in special circumstances. Accordingly, when reviewing the evidence in the case, this Court finds, as a matter of law, that the plaintiff Laverpool's position as a Special Inspector was a "safety-sensitive" position (*See Skinner, supra*, 489 U.S. at pp. 616–20, 109 S.Ct. at pp. 1412–15 [general rules]; *Burka, supra*, 739 F.Supp. at pp. 821–26 [application of *Skinner* guidelines to Transit Authority]). Therefore, since the Transit Authority had the authority to drug test, this plaintiff would have to establish that it was improper for the Transit Authority to rely on the testing by CompuChem or that the procedures were knowingly improper.

The plaintiffs Jackson and Browne were both bus operators, which are clearly safety sensitive positions, therefore, these plaintiffs would also have to establish that it was improper for the Transit Authority to rely on the testing by CompuChem or that the procedures were knowingly improper.

The plaintiff Wilder held the job title of "conductor" and worked as a mail clerk at the time of his second drug test. He worked as a conductor at the time of his first drug test. Although the position of conductor is clearly "safety-sensitive", as is alleged in the complaint (*see* Second Amended Complaint, at ¶ 217), the plaintiff asserts that his position as a mail clerk is not safety-sensitive.

In opposition to this contention, the defendant Transit Authority asserts two alternative propositions. First, the Transit Authority contends that since the plaintiff Wilder still held the job title of a "conductor" and presumably could resume the safety-sensitive duties of a conductor at any time, the Transit Authority is properly able to test him. Alternatively, the Transit Authority asserts that since the plaintiff Wilder had previously tested positive for a controlled substance, they were entitled under their regulations to conduct random retests.

In addressing the assertion that the "job title" of "conductor" entitled the Transit Authority to continue drug testing, despite the actual duties performed by the plaintiff, the Court notes that Judge Patterson in the *Burka* case made many references to "job title" when articulating his determinations concerning the ability of the Transit Authority to conduct drug tests. For example, Judge Patterson stated that the defendants would be liable to the plaintiffs for "violations of ... the search and seizure rights of those class members who were tested, between January 1, 1984 and April 1987, when they were either employees with non-safety-sensitive *job titles*, applicants for non-safety-sensitive *job titles*, or employees (with non-safety-sensitive *job titles*) seeking promotion to non-safety-sensitive *job titles*" (*Burka v. New York City Transit Authority*, 747 F.Supp. 214, 217 [S.D.N.Y.1990]). Another *Burka* decision specifically states:

> "In this case, plaintiffs only concede that five of the positions covered by the TA's drug testing program are safety sensitive: train operator, bus operator, tower operator, *train conductor* and conductor-flagman. Inattentiveness by workers with those five *titles* clearly can result in serious harm to either the public or other workmen" (*Burka v. New York City Transit Authority*, 739 F.Supp. 814, 821 [S.D.N.Y.1990] [emphasis added]).

There is no qualification by Judge Patterson that his statements apply only to employees with these job "titles" while the employees are actively engaged in the safety-sensitive aspects of their duties.

The alternative argument by the Transit Authority is that, according to their published regulations, they are entitled to randomly test an employee who previously tested positive for drugs. It is conceded by all that the Transit Authority employees were required to follow the published rules and regulations of the New York City Transit Authority. Plaintiff's exhibit 24 is such a rule and is

titled: "Policy Instruction—Drugs and Controlled Substance". According to the testimony of Ella Hill, this document was in effect at the time CompuChem conducted the drug tests for the Transit Authority, the relevant time period involved in this action. This "Policy Instruction" states, in relevant part, as follows:

"It is the policy of the Authorities to operate and maintain its transportation facilities in a safe and efficient manner and to provide a safe work environment for its passengers and employees. Possession or the use of Drugs or Substances that may prevent an employee of the Authority from performing the duties of his/her job safely or in a manner that would constitute a threat to the property or the safety of others is prohibited" (Policy Instruction, "Policy", § 1.1).

Further, this Policy Instruction provides that:

"The purpose of this [Transit Authority Policy Instruction] is to set forth policies and procedures concerning employee possession or use of Controlled Substances, as defined in paragraph 4.1, including marijuana, and any Drug or Substance which may impair job performance or pose a hazard to the safety of others" (Policy Instruction, "Purpose", § 2.1).

Specifically with respect to the assertions by the plaintiff Wilder in this case, this Policy Instruction clearly states that:

"Employees of the Authority shall submit to Drug screening testing when ordered to do so, and additionally in the following circumstances ... when a Controlled Substances has been identified in a prior test" (Policy Instruction, "Reporting and Testing of Controlled Substances, Drugs and Marijuana", § 5.3.5).

When examining these regulations, the Court notes that the *Burka* case, on which the present action apparently has been modeled, did not address the issue of plaintiffs who previously tested positive. Specifically, Judge Patterson notes, in a footnote, that "[p]laintiffs do not challenge testing in circumstances after a positive test or when a supervisor suspects drug impairment. Thus the Court need not decide whether those circumstances constitute reasonable suspicion" (*Burka v. New York City Transit Authority*, 739 F.Supp. 814, 829 n. 10 [S.D.N.Y. 1990] ).

A similar regulation was upheld in Washington State after an attack by the Airline Pilots Association. In *Airline Pilots Association Int'l v. Alaska Airlines, Inc.*, 702 F.Supp. 1485 (W.D.Wash.1987), *aff'd*, 898 F.2d 1393 (9th Cir.1990), the court examined a regulation which included a provision that "[a]ny employee who tests positive on a drug screen and later returns to work under the new rules is thereafter subject to mandatory drug testing without prior notice" (*Airline Pilots, supra,* 702 F.Supp. at p. 1485). The Court held that not only did the plaintiff fail to establish that it had a basis for an injunction preventing the enforcement of the regulations, including that regulation cited above, but since there were no other issues to resolve in the case, the defendant was entitled to a judgment on the entire action (*Airline Pilots, supra,* 702 F.Supp. at p. 1488).

This Court finds, as a matter of law, that the Transit Authority regulation permitting mandatory drug screening "when a Controlled Substance has been identified in a prior test" (Policy Instruction, at § 5.3.5) satisfies the Fourth Amendment requirement for reasonableness (*See Skinner, supra,* 489 U.S. 602, 109 S.Ct. 1402).

Further, the Court finds that it is also reasonable, within the confines of the Supreme Court authority cited above, to test employees, or prospective employees, in safety-sensitive positions when: (1) they apply for employment; (2) they have their routine physical examination; (3) they are seeking promotion to another safety-sensitive position; (4) they return to work after an extended absence or suspension; and (5) they resume work after an incident while on duty. The plaintiffs Laverpool and Wilder, as employees of the Transit Authority, had to conform to the reasonable drug testing policy of the Transit Authority.

Having found a proper basis for the Transit Authority to test the plaintiffs Laverpool, Wilder, Browne, and Jackson, the Court will address whether the Transit Authority prop-

erly relied upon the results of the CompuChem laboratory, or whether the CompuChem tests were improperly made, to the knowledge of the Transit Authority.

### Drug Testing Procedures:

■ A report prepared by the Office of the Inspector General of the Metropolitan Transit Authority, dated December 9, 1991 (Plaintiff's Exhibit 11), addresses the Transit Authority's drug testing contract with the CompuChem laboratory. This document, was introduced by the plaintiff Laverpool as evidence of the incompetence of the drug testing laboratory. The report states that on one occasion nine of ten urine test samples, which were all originally certified as "drug negative", were "spiked" with known concentrations of drugs. The tenth sample remained "drug negative". These ten samples were submitted to CompuChem for analysis. The report states that after testing the ten samples:

"CompuChem properly identified and reported the drugs in six of the ten spiked samples. These samples contained cocaine, codeine, meperidine, morphine, methadone, and methaqualone. One sample, though properly identified by CompuChem as containing the spiked drug hydromorphone, was reported as negative to the Transit Authority. CompuChem properly reported the unspiked sample as negative.

\* \* \* \* \* \*

It is important to note that we do not attempt to make an overall assessment of CompuChem Laboratory's competence or performance level either in general or specifically in regard to the testing it conducted for the TA ... One small sample, tested on one day and in one test batch, while not providing the basis for an overall assessment of a particular laboratory's competence, does point out the need for the TA to monitor, on an ongoing basis, the level of performance and reliability of any lab with which it works" (Report, dated December 9, 1991 [emphasis added] ).

This proof is insufficient to establish, prima facie, that the tests conducted by CompuChem with regard to the plaintiffs in this case were not properly done. This proof does not concern the particular tests conducted on the plaintiffs in this case, nor in this Court's view, could a reasonable jury find from this evidence, including this report, that the particular tests involved in this case were improperly conducted, or that the tests were inaccurate, or that the Transit Authority should not have relied upon these tests.

Ella Hill, a former plaintiff in this action, testified that the specimens were collected in the medical department and then sent to CompuChem on a daily basis. Someone at CompuChem would then retrieve the aliquot portion from "Bottle A" for testing at the laboratory in North Carolina. The initial test conducted was the EMIT Test, which is an acronym for Enzyme Multiplied Immunoassay Technique. If this test yielded a positive result, a second aliquot portion from "Bottle A" was tested using the GCMS Test, which is an acronym for Gas Chromatography Mass Spectrometry, which is a more accurate test to identify the controlled substance in the urine specimen.

Ms. Hill further testified that in May 1987 she observed thousands of bottles of specimens held in the medical department. She further testified that there were unspecified "problems" with the lab regarding the contract with CompuChem. Her testimony also included the assertion that prior to using CompuChem, urine samples for drug testing were kept under lock and key, however after the Transit Authority started using CompuChem, Ms. Hill testified that the urine samples were kept in cardboard boxes in the medical department, near a window. Assuming the truth of the testimony, there is no evidence that even with that method of storage, it affected the analysis of the urine samples in any manner. There is just no evidence that storing the bottles in cardboard boxes was an improper procedure or would affect the results to any extent.

The plaintiff Percy Jackson testified about his experience with the urine testing procedures employed by the Transit Authority. Mr. Jackson testified that he went into the mens room and urinated into a cup. Thereafter he took the cup to the "lab" and two technicians in the "lab" asked him for his payroll number. He testified that he poured

the urine into two bottles, filled out and signed the urinalysis form, sealed the bottles, signed the labels, placed the urine sample bottles back into the box, and the boxes were shipped out. This testimony does not present any evidence of an improper testing procedure.

Lawrence Mobley testified that he tested positive for cocaine on two occasions. He further testified that on the occasion of his May 4, 1990 drug test he "didn't have to go to the bathroom" and therefore placed "tea water" into the urine sample bottles. He stated that this drug test also yielded positive results. Even when drawing all reasonable inferences in favor of the plaintiffs, the Court notes that this alleged Mobley "tea incident" occurred on or about May 4, 1990, two years after Mr. Laverpool's drug test and sixteen months after Mr. Wilder's drug test. This testimony, taken in its entirety, when viewed with all reasonable inferences in favor of the plaintiffs, still does not present any evidence of an improper testing procedure by CompuChem, or improper reliance by the Transit Authority at the time of the tests given to the plaintiffs in this case.

Andrew Wilder testified that when he was requested to provide a urine sample to the Transit Authority, he filled two bottles and they were sent to CompuChem. He knew that the second bottle was for his use at another laboratory. Mr. Wilder further testified that although he requested a confirmation test, he never heard from the CompuChem lab.

He also testified that there were records of drug tests which indicated both a positive drug test result for marijuana and a negative drug test result for marijuana on the same day. However, the documentation in support of this assertion, Defendants' Exhibit AK, in evidence, shows that although both a positive and negative test result were reported on the same date, February 15, 1988, the date that the samples were received was different and the "Accession Number" was different which indicates that a different test sample was used for each drug test. Further, the evidence consists of receipts from "Clin Path/Tox, 15 Frederick Place, Hicksville, N.Y. 11801", which has absolutely nothing to do with the drug tests at issue in this case, or with the CompuChem laboratory.

In addition, the Court considered the Department of Transportation Report, which has only been marked for identification, as plaintiff's exhibit 3. Initially, the Court notes that this report summarizes the work of a substance abuse team who was evaluating the Transit Authority drug testing procedures, from August through December 1991 and is described as a "snapshot" of the drug testing procedures (Exhibit 3, at p. 2). The period of time evaluated by the "snapshot" report is over two and one-half years after the period of time relevant to this cause of action. In fact, it is three and one-half years after the drug test for plaintiffs Laverpool, Wilder, and Jackson.

Although this voluminous document neither refers to the time period involved in this action, nor was it formally introduced into evidence, the Court reviewed the document, as if it were introduced into evidence and finds that it contains no evidence about the supposed incompetence of the drug testing laboratory CompuChem. In fact, at the time this report was compiled CompuChem did not conduct drug tests, but rather only conducted blood tests. The lab MetPath was used for urine testing (See Report, at p. 46).

Further, this report states that the Transit Authority was in compliance with the *Burka, supra,* decision (See Report, at p. 42). The major problem addressed by this 55 page report is that although the Transit Authority employees received a copy of the drug testing policy and procedures, many employees did not fully understand the procedures involved (See Report, at pp. 50–51, 53).

Based upon the foregoing evidence, including the Department of Transportation Report, the Court finds, as a matter of law, that there is a complete absence of any evidence from which a reasonable jury could find that the testing procedures employed by the laboratory CompuChem were flawed and/or that the test results should not have been relied upon by the Transit Authority (See *Weldy, supra,* 985 F.2d at pp. 59–60).

Accordingly, the motion for a judgment as a matter of law dismissing the claims of the

plaintiffs Laverpool, Wilder, Browne, and Jackson based upon a Section 1983 search and seizure cause of action is granted.

### (3) Equal Protection

The plaintiffs allege in the second amended complaint that the drug testing policy of the Transit Authority was being applied in a manner that discriminated against the plaintiffs, who are black and therefore violated the Equal Protection Clause (*See* Second Amended Complaint, at ¶¶ 47, 170, 300). According to the Supreme Court, the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike" (*City of Celburne v. Celburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 [1985]; *see also Brady v. Colchester,* 863 F.2d 205, 216 [2d Cir.1988] [discussing Equal Protection Clause]).

 Since the Court has already determined, as a matter of law, that the drug testing policy for the plaintiffs was facially valid, in order to establish their claim of a violation of the Equal Protection Clause, the plaintiffs must prove that:

"(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race ... to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person" (*FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 [2d Cir.1992]).

In the present case, the plaintiffs Laverpool, Wilder, Browne, and Jackson, who are black, failed to submit any evidence that there was any selective treatment with regard to any of them. There has been no evidence adduced that white employees were treated in any manner differently than black employees of the Transit Authority.

Although Ella Hill testified that ninety-five (95) percent of the disciplinary proceedings involved black persons, she did not testify that this was disproportionate compared with the demographics of the Transit Authority employees, generally or the safety sensitive employees in particular.

In addition, even if the Court construes the testimony of Ms. Hill as sufficient to demonstrate prima facie evidence of selective treatment of black employees of the transit authority, there has been no evidence adduced by any witness, or through any document, that this disparate treatment was based upon an intent by the Transit Authority to discriminate against the plaintiffs Laverpool and/or Wilder based upon their race (*See FSK Drug Corp., supra,* 960 F.2d at p. 10).

 Further, should the plaintiffs assert the claim that the drug testing policy of the Transit Authority, as a whole, violates the Equal Protection Clause, the plaintiffs must show that the determination to drug test the employees of the Transit Authority is not rationally related to a legitimate governmental interest (*See Western & Southern Life Ins. Co. v. State Board of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 [1981]). There has been no evidence presented by the plaintiffs that the drug testing policy of the Transit Authority is not rationally related to a legitimate governmental interest. On the contrary, the proof is clear that this policy is rationally related to an important, legitimate governmental interest.

The Court finds, as a matter of law, that there is a complete absence of any evidence from which a reasonable jury could find that the plaintiffs were selectively treated. In addition, even if there was evidence of selective treatment, there is no evidence that the selective treatment was due to discrimination on the basis of race. Accordingly, the motion for a judgment as a matter of law dismissing the claims of the plaintiffs Laverpool, Wilder, Browne, and Jackson, based upon a Section 1983 Equal Protection cause of action, is granted.

### (4) Section 1985 Civil Rights Conspiracy

The second amended complaint alleges in paragraph 23 that the defendants violated 42 U.S.C. § 1985. This statute provides, in relevant part, that:

"[i]f two or more persons in any State ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against only one or more of the conspirators" (42 U.S.C. § 1985[3]).

The Second Circuit has recognized that in order to state a claim under this statute, the plaintiff must allege that "he was a member of a protected class, that the defendants conspired to deprive him of his constitutional rights, that the defendants acted with class-based, invidiously discriminatory animus, and that he suffered damages as a result of the defendants' actions" (*Gleason v. McBride*, 869 F.2d 688, 694–95 [2d Cir.1989]).

In the present case, the Court initially notes that the second amended complaint is completely devoid of any enumerated "cause of action" asserting a violation of Section 1985. However, assuming that such a cause of action in civil rights conspiracy was properly pleaded for the plaintiffs Laverpool and Browne, the only plaintiffs who did not withdraw this cause of action, the Court finds that there has been no evidence introduced by the plaintiffs from which a reasonable jury could conclude that there was a conspiracy by these defendants, or anyone else, to violate their civil rights with regard to their employment with the Transit Authority.

Accordingly, the defendants' motion for judgment as a matter of law dismissing whatever Section 1985 Civil Rights conspiracy cause of action may have been alleged by the plaintiffs Laverpool and Browne, is granted.

### Civil RICO Claims:

The Racketeer Influenced and Corrupt Organizations Act, commonly known as RICO, makes it unlawful to participate in the conduct of an enterprise's affairs "through a pattern of racketeering" (*See* 18 U.S.C. § 1962[c]). Section 1964(c) permits a private party to commence a cause of action under the RICO statute.

The Second Circuit requires the plaintiff to allege the following:

"First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 (1976), commonly known as 'criminal RICO.' In so doing, he must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce.... Plaintiff must allege adequately defendant's violation of section 1962 before turning to the second burden—*i.e.*, invoking RICO's civil remedies of treble damages, attorneys fees and costs.... To satisfy this latter burden, plaintiff must allege that he was 'injured in his business or property *by reason of* a violation of section 1962'" (*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 [2d Cir. 1983], *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 [1984] [citations omitted]; *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 [1985]).

An "enterprise" for the purposes of civil RICO includes any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity" (18 U.S.C. § 1961[4]). It "is generally a *group of persons* associated together for a common purpose of engaging in a course of conduct" (*Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 15 [2d Cir. 1989], *cert. denied*, 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 [1990] [emphasis in original]; *see also United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 [1981]). The second amended complaint states that the enterprise consists of the contractual business relationship between the defendants and the laboratory, CompuChem, which was "directed toward attaining a single goal of establishing a related and continuing activity of knowingly using inaccurate and unreliable urinalysis testing" (Second Amended Complaint, at ¶ 17).

No evidence has been adduced, direct or circumstantial, that there was an enterprise

consisting of the defendants and CompuChem. Further, there was no evidence that these defendants and CompuChem engaged in a course of conduct to knowingly use inaccurate and/or unreliable urinalysis testing. Accordingly, the Court finds, as a matter of law, that the plaintiffs have not established that there was any such "enterprise" between the defendants and CompuChem.

■■■ With regard to the element of racketeering predicate acts, the Court will review the record to determine whether the plaintiffs have presented evidence of any racketeering predicate acts, of which two are needed to sustain the RICO claim.

"Racketeering activity" refers to the predicate acts necessary to sustain a RICO claim. The predicate acts include, *inter alia,* violent crimes (*e.g.,* murder, kidnapping), bribery, pornography, narcotics trafficking, gambling, embezzlement, securities fraud, mail fraud, and wire fraud (*See* 18 U.S.C. § 1961[1]).

■■■ A "pattern" requires at least two acts of "racketeering activity", occurring within ten years of each other (18 U.S.C. § 1961[5]). In particular, to form a "pattern of racketeering", the predicate acts must be related and constitute a threat of continued racketeering activity, which is to be determined on a case-by-case basis (*See H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 238–43, 109 S.Ct. 2893, 2900–02, 106 L.Ed.2d 195 [1989]; *see also United States v. Indelicato,* 865 F.2d 1370, 1381 [2d Cir.] [en banc], *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 [1989]).

In the present case, the plaintiffs contend that the "racketeering activity" consisted of: (1) a "bribe" offered to Arbitrator Simmelkjaer by the Transit Authority; (2) that the CompuChem laboratory did not have a proper New York State license to conduct drug testing during the relevant period; (3) that the test results indicating that Frederick Laverpool tested positive was fraudulent; and (4) an alleged mail or wire misrepresentation by CompuChem that it had a New York State license.

*The Bribe:*

In addressing the alleged "bribe", Mr. Laverpool testified that the basis for this assertion is the following chronology: First, the plaintiff Laverpool's arbitration hearing was held before Arbitrator Simmelkjaer. Second, at some point after Laverpool's initial arbitration hearing and prior to the award, the Transit Authority approached Simmelkjaer and informed him that there was a position available with the Transit Authority as a hearing examiner. Third, Simmelkjaer's decision was in favor of the Transit Authority and against Mr. Laverpool. Fourth, Simmelkjaer accepted the Transit Authority's offer to be a hearing examiner. Fifth, a New York State Supreme Court Justice vacated the award as arbitrary and capricious because of a conflict of interest.

The second amended complaint specifically states, with respect to the alleged bribe, that:

"In carrying out the scheme to defraud and deny constitutional and civil rights of the plaintiff, defendants and participant drug screening laboratories engaged inter alia in conduct in violation of laws of the State of New York to wit: *Bribery of A New York State Public Servant in Violation of Criminal Procedure Law Z00–00* [sic], Urinalysis Testing without proper health licensing in violation of New York State Public Health Laws fraudulently awarding contracts in a bid-rigging scheme" (Second Amended Complaint, at ¶ 55 [emphasis added]).

Further, the second amended complaint states that:

"Upon information and belief on or about June 1990 an official complaint was filed with the Brooklyn District Attorney's Office against Defendants SUARDY, BUCKLEY, GUNN, CORBIN, BENJAMIN, FROHINGER, and AGRITELLY, for the complaint of conspiracy to bribe a public servant, Defendant SIMMELKJAER in Violation of New York State Penal Law 200.00 and for the complaint of conspiracy" (Second Amended Complaint, at ¶ 107).

The portion of the second amended complaint which sets forth the "Fifth Cause of Action" for violations of Civil RICO, specifically states that the plaintiffs are complaining about the defendants actions "in their use of bribery in soliciting *public officers* to influ-

ence their actions" (Second Amended Complaint, at ¶ 335 [emphasis added]).

The evidence introduced by the plaintiffs at trial indicates that Arbitrator Simmelkjaer, was neither a public official or a public officer at the time of this offer. Under New York State Penal Law Section 200.-00, the theory under which the plaintiff Laverpool asserts he is proceeding, the person being bribed must be a public servant (*See* N.Y. Penal Law § 200.00). Similarly, under federal bribery law, the person who receives the bribe must be a federal official (*See* 18 U.S.C. §§ 201–225).

Although the Court recognizes that there is a statute governing commercial bribery, however this statute is neither set forth in the second amended complaint, nor was there any proof of commercial bribery. This statute is usually used in the context of a salesman bribing the purchasing agent of a company in order to have the purchasing agent purchase goods from the salesman. No such situation exists in this case.

Since, Simmelkjaer is neither a public official, officer, or servant, no criminal statute is violated and no therefore this act does not constitute a criminal RICO predicate act.

*Drug Testing License:*

The second alleged racketeering act is the contention that CompuChem was not licensed by the State of New York in accordance with N.Y. Public Health Law § 575 and this, in itself, constitutes a RICO predicate act. According to the applicable Public Health Law provision:

"A person who owns or operates a laboratory after July first, nineteen hundred sixty-five, and who does not hold a valid laboratory permit issued pursuant to or otherwise complies with the provisions of this title or the New York city health code, as the case may be, is guilty of a misdemeanor, punishable by imprisonment for not more than one year, or by a fine of not more than five hundred dollars, or by both such fine and imprisonment" (N.Y.Pub. Health Law § 578[1] [1990]).

Although the plaintiff introduced evidence that the CompuChem laboratory did not have a license to operate a laboratory in New York State prior to August 1987, the Court notes that Mr. Laverpool's test which occurred on May 4, 1988, Mr. Wilder's test which occurred on January 3, 1988, and Mr. Browne's test which occurred on or about April 7, 1989, all occurred while CompuChem was licensed. Only Mr. Wilder's drug test on or about June 25, 1987 was conducted while CompuChem did not hold a license.

In any event, the predicate acts enumerated in the RICO statute involve conduct which would result in potential imprisonment for more than one year, namely a felony (*See* 18 U.S.C. § 1961[1]). The Court finds, as a matter of law, that the failure to have a license to conduct drug testing, even if it did violate the New York Public Health Law, is act is not a predicate racketeering act, within the provisions of Section 1961.

*Incorrect Positive Test Result:*

█ The plaintiff Laverpool further asserts that a racketeering act consisted of the incorrect positive drug test results for his May 4, 1988 drug test. Although Mr. Laverpool testified that he was drug free at the time of the drug test, and the Court must give the benefit of all reasonable inferences to the plaintiff, there has been no evidence presented of fraud. According to the Second Circuit, "[t]he elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff" (*Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 [2d Cir. 1987]). In other words, the plaintiff must provide by direct or circumstantial evidence, that the defendants knew or should have known that the Laverpool test results were false. There is absolutely no such evidence in this case. Nor is there any evidence that the Transit Authority used test results from CompuChem, knowing that the results were false.

Additionally, federal mail and wire fraud provisions (*see* 18 U.S.C. §§ 1341 [mail]; 1343 [wire]) both require an intent to defraud. In the present case, even if the Court determines that Mr. Laverpool's test results were incorrect, he has not presented any evidence of any intent by the Transit Authority and/or CompuChem to defraud him.

Therefore the test results, even if incorrect, could not form a basis for a mail or wire fraud violation.

Likewise, should the Court construe the plaintiffs allegations as alleging that the mailing of his test samples constituted the mailing in connection with the fraud, the Court notes that there has been no evidence submitted that the Transit Authority and/or CompuChem intended to defraud the plaintiff.

*Misrepresentation About License:*

Finally, Mr. Laverpool asserts that CompuChem made a representation that they were licensed by New York State and New York City, when they were not. However, the plaintiff cannot indicate the document or telephone conversation which included that alleged misrepresentation. Accordingly, since the Court determines that there is no evidence presented which would support this assertion, this assertion cannot be credited as a RICO predicate act.

Even if the bribery allegation was sufficient to be a racketeering predicate act, it alone would not comply with the mandatory provision for two racketeering acts because there is no evidence of a second predicate act. Accordingly, since the plaintiffs have failed to produce evidence of any racketeering acts, and if they did, they did not establish two related and continuous RICO racketeering predicate acts, the defendants' motion for a judgment as a matter of law dismissing the RICO claims of the plaintiffs Laverpool and Browne is granted.

**Title VII Discrimination:**

A claim based upon unlawful employment practices is governed by 42 U.S.C. § 2000e-2(a) which states, in relevant part, that:

"(a) It shall be an unlawful employment practice for any employer—

(1) ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... race ...; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment op-

portunities or otherwise adversely affect his status as an employee, because of such individual's ... race ..." (*Id.*).

■ In many cases, to assert a prima facie case of discrimination under section 2000e-2(a) a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was discharged; and (4) after his discharge the position remained open and was ultimately filled by a white person (*See St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 [1993] [*citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) ]; *see also Rosen v. Thornburgh,* 928 F.2d 528, 532 [2d Cir.1991]; *Lopez v. Metropolitan Life Insurance Co.,* 930 F.2d 157, 161 [2d Cir.], *cert. denied,* —— U.S. ——, 112 S.Ct. 228, 116 L.Ed.2d 185 [1991] ).

In the present case, the Court initially notes that the second amended complaint is completely devoid of any enumerated "cause of action" asserting a violation of Title VII of the Civil Rights Act of 1964. There are only two references to this claim in the entire second amended complaint. The first is contained in paragraph 23 which merely cites the statute, and says nothing more. The second is paragraph 34 which states that the plaintiff Laverpool received a right-to-sue letter and that this second amended complaint was filed within ninety (90) days of the receipt of the letter.

The period for commencing a civil action under Title VII is governed by 42 U.S.C. § 2000e-5 which states, in relevant part, that:

"[i]f a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, ... [the Commission] shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge ... by the person claiming to be aggrieved" (42 U.S.C. § 2000e-5[f] [f] [1] ).

The Second Circuit has stated that "[t]he jurisdiction of the United States District Court to hear and consider [the plaintiff's]

suit depended upon its being brought within the 90–day limitation period" (*DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 310–11 [2d Cir.1975] ). It was recognized by the Second Circuit that "[t]he jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation" (*DeMatteis, supra,* 511 F.2d at p. 311 [*quoting American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 17, 71 S.Ct. 534, 542, 95 L.Ed. 702 (1951) ] ).

 As mentioned above, whatever Title VII claims were asserted by the plaintiffs Jackson, Wilder, Jones, and Gill were withdrawn on October 18, 1993. Since the second amended complaint only alleges that the plaintiff Laverpool received the right-to-sue letter and commenced this action within ninety (90) days, and there is no evidence presented by the plaintiff Browne with respect to the issue of the right-to-sue letter, the Court finds, as a matter of law, that the plaintiff Laverpool is the only party who has sufficiently pleaded a Title VII claim. The motion by the defendants for a judgment as a matter of law as to the plaintiff Browne dismissing his Title VII claim is granted.

 In evaluating Mr. Laverpool's Title VII claim, the only remaining Title VII claim, the Court determines that he satisfies the first element of the prima facie case, namely he is black and therefore a member of a protected class. When addressing the element involving whether he was qualified for the position he held, the Court notes that the Transit Authority takes the position that he was not qualified because he tested positive for cocaine. Mr. Laverpool asserts that he was qualified because he never used cocaine. Although this issue of fact would have to be resolved by the Court as the trier of fact (*see United States v. Burke,* — U.S. —, —, 112 S.Ct. 1867, 1873, 119 L.Ed.2d 34 [1992] ), or by the jury in an advisory decision, the Court will presume, for the purposes of this Rule 50 motion, that he established that he was qualified.

Initially, the Court notes that the plaintiff Laverpool has presented no evidence that his position as a Special Inspector was ultimately filled by a white person or that he was replaced by a white person. Additionally, although the plaintiff Laverpool asserts that three white Transit Authority employees were not terminated because of drug use, he has not presented any evidence that this action was disproportionate to the number of black Transit Authority employees who were not terminated for drug use.

If the Court were to consider, for the purposes of this motion, that Mr. Laverpool established his prima facie case of Title VII discrimination, the Transit Authority has introduced evidence of Laverpool's positive drug test result which would constitute a nondiscriminatory reason for the plaintiff's termination. This drug test, which was positive for cocaine, would appear to be one of the most demonstrative, objective, nondiscriminatory reasons for discharging an employee.

Further, even if the Court were to construe the plaintiff's evidence as establishing that the drug test itself was the "pretext" for terminating the plaintiff Laverpool, the Supreme Court recently clarified its requirement that an employer should not be held liable "unless an appropriate factfinder determines, according to proper procedures, *that the employer has unlawfully discriminated*" (*Hicks, supra,* — U.S. at p. —, 113 S.Ct. at p. 2751 [emphasis in original] ). When touching upon this ultimate analysis, the Court finds that Mr. Laverpool has presented no evidence "that the employer has unlawfully discriminated" and therefore he has failed to satisfy the "pretext plus" requirement recently enunciated by the Supreme Court in *Hicks*. Therefore, the Court finds, as a matter of law, that the plaintiff Laverpool has failed to establish a Title VII cause of action.

Accordingly, the defendants' motion for a judgment as a matter of law dismissing the Title VII claim of the plaintiff Laverpool is granted.

### Rehabilitation Act of 1973:

This act states, in relevant part, that:

"[n]o otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied

the benefits of, or be subject to discrimination under any program or activity conducted by any Executive agency" (29 U.S.C. § 794[a] ).

According to the definition portion of the statute, an individual with a disability "does not include an individual who is currently engaging in the illegal use of drugs" (*see* 29 U.S.C. § 706[8][C][i] ). However, the definition of an individual with a disability may include a person who: (1) has completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, (2) is participating in a supervised drug rehabilitation program and is no longer using drugs; or (3) is erroneously regarded as engaging in such use, but is not engaging in such use (*See* 29 U.S.C. § 706[8][C][ii] ).

In the present case, the Court initially notes that the second amended complaint is completely devoid of any enumerated "cause of action" asserting a violation of the Rehabilitation Act of 1973. Only the plaintiffs Browne and Pollard mention this statute in describing the actions of the Transit Authority, with respect to them (*See* Complaint, at ¶¶ 272 [Browne] and 286 [Pollard] ). Since the action by the plaintiff Pollard was settled during the course of the trial, the only remaining plaintiff with this cause of action is the plaintiff Browne.

According to the Second Circuit, in a very recent opinion, "[i]n order to establish a prima facie case [under the Rehabilitation Act of 1973 (29 U.S.C. § 794) ] [a party] must show that at the time of the discharge (1) they were handicapped within the meaning of the Rehabilitation Act; (2) they were otherwise qualified to perform the essential functions of their given positions; (3) they were discharged solely on the basis of their handicaps; and (4) [their employer] receives federal financial assistance. *Doe v. New York Univ.*, 666 F.2d 761, 774–76 (2d Cir.1981)" (*Bates v. Long Island Railroad Co.*, 997 F.2d 1028, 1035 [2d Cir.1993]; *see also Guice–Mills v. Derwinski*, 967 F.2d 794, 797 [2d Cir.1992] ).

■ In examining the plaintiff Browne's cause of action under the Rehabilitation Act, the Court first notes that Browne testified that he never used drugs and denied those portions of his deposition testimony which included statements about drug use. Therefore, he cannot proceed as a rehabilitated drug user. Further, even if Browne was covered by the Rehabilitation Act, the plaintiff Browne entered into evidence a settlement agreement with the Transit Authority, dated September 7, 1988 (Plaintiff's Exhibit 42), which provided, in relevant part, that:

> "(1) The Authority will reduce the dismissal of Keldric Browne, Pass Number 108062 to a 30 day suspension and final warning. His reinstatement to employment will be without back pay.

> * * * * * *

> (3) The Grievant shall fully comply with Employees Assistance Program. His failure to do so shall permit the Authority to discharge him.
> (4) *The Authority may terminate Mr. Browne pursuant to 2 and 3 above at its discretion. Said discharge shall not be Arbitrable* " (Settlement Agreement, dated Sept. 7, 1988 [emphasis added] ).

In a memorandum from the Transit Authority dated July 18, 1990, Robert Finch, C.S.W., Clinical Manager, EAP (Plaintiff's Exhibit 43), stated:

> "Employee Mr. Keldric Browne, Pass # 108062 has been discharged from the Employee Assistance Program (EAP) in accordance with P/I 6.0.3.
> The client has failed to complete his treatment in the twelve (12) months prescribed by the Authority's Policy Instruction. A copy of this action is being sent to this employee" (Memorandum, dated July 18, 1990).

In examining this evidence presented by the plaintiff Keldric Browne, the Court finds that this plaintiff has failed to present evidence that he was discharged *solely* on the basis of his handicap (*See Bates, supra*, 997 F.2d at p. 1035). Accordingly, the defendants' motion for a judgment as a matter of law dismissing the Rehabilitation Act claims of the plaintiff Browne is granted.

### *Robert F. Kiley:*

■ Finally, there has been no evidence presented, whatsoever, that the defendant

**1466**

Robert F. Kiley has committed any wrongdoing or tortious conduct or violated any constitutional right. In addition, with respect to the Section 1983 claims, even if it were asserted that Robert F. Kiley's liability is predicated upon respondeat superior, the Second Circuit has stated that "[t]he doctrine of respondeat superior is unavailable as a basis for imposing liability under § 1983; there must be some showing of *personal responsibility*" (*Duchesne v. Sugarman,* 566 F.2d 817, 830 [2d Cir.1977] [emphasis added]).

Further, as to the suit against Kiley in his individual capacity, there is no evidence that he violated any clearly established rule of law (*See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 [1982]; *see also Zavaro v. Coughlin,* 970 F.2d 1148, 1153 [2d Cir.1992] [right must be clearly established]). He is therefore, alternatively, entitled to dismissal based upon the doctrine of qualified immunity.

Accordingly, the defendants' motion for a judgment as a matter of law dismissing the entire second amended complaint against the defendant Robert F. Kiley, is granted.

### CONCLUSION

Based upon the foregoing, the motion by the defendants for a judgment as a matter of law dismissing all of the causes of action by all of the plaintiffs is granted.

The Clerk of the Court is directed to enter a judgment dismissing the second amended complaint, with prejudice.

**SO ORDERED.**