Gregory P. **JONES**, Plaintiff,

v.

**ASSOCIATED UNIVERSITIES, INC. and Russel J. Reaver, Defendants.**

No. 92–CV–2681 (JS).

United States District Court, E.D. New York.

Dec. 12, 1994.

---

Leeds & Morelli by Steven A. Morelli, Carle Place, NY, for plaintiff.

Kaye, Scholer, Fierman, Hays & Handler by Andrea S. Christensen, and Tracy L. Brown, New York City, for defendants.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

This is an employment-discrimination action brought by plaintiff Gregory P. Jones under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701–796, against his former employer and one of his supervisors. Plaintiff alleges that he was discharged from his position as a lieutenant with the police group at Brookhaven National Laboratories, in Upton, New York, solely because he had Lyme disease. A jury trial was held in this action from April 7, 1994 through April 15, 1994 which resulted in a verdict in plaintiff's favor in the amount of $320,000. This award was comprised of damages (i) for lost wages in the amount of $100,000, (ii) for actual pecuniary losses in the amount of $20,000, and (iii) for emotional distress, on a supplemental claim under the New York State Human Rights Law, in the amount of $200,000.

Pending before the Court are the parties' post-trial applications. First, the defendants renew their application at trial, pursuant to Rule 50 of the Federal Rules of Civil Procedure, for judgment as a matter of law. In the alternative, the defendants move for a new trial, pursuant to Fed.R.Civ.P. 59, on the grounds that the jury's verdict is against the weight of the evidence, and contrary to law, and on the basis that the damage award of $320,000 is unsupportable as a matter of law. The plaintiff, in turn, cross-moves for an order reinstating him to his former position as a lieutenant, and for attorney's fees in the amount of $98,039.60, pursuant to 29 U.S.C. § 794a.

## FACTUAL BACKGROUND

Viewed in the light most favorable to the plaintiff,[1] evidence was introduced at trial to show that defendant Associated Universities, Inc. operates Brookhaven National Laboratory [alternatively, the "Laboratory," or the "Lab"], a nuclear research facility, pursuant to a contract with the United States Department of Energy [the "DOE"]. Tr. 567 (testimony of Dr. Breitenstein). The Laboratory is funded by the United States government. Because of the presence of nuclear materials on the Laboratory's premises, the DOE requires the Lab to maintain an armed security force, which the Lab provides through its police group [the "Police Group"]. Russel J. Reaver, a codefendant in this action, at all times relevant held the position of Manager of the Police Group. Tr. 231 (testimony of Reaver).

The Police Group, in turn, is regulated by the DOE, which prescribes mandatory medical and fitness qualification standards for protective force personnel. See 10 C.F.R.

---

1. The standards governing the Court's review of the evidence presented at trial are set forth *infra* in Part I of the Discussion section.

§ 1046.11 (1992). During the period relevant to this action, the DOE's annual requirements applicable to lieutenants in the Laboratory's Police Group included the completion of a one-mile run within eight minutes and thirty seconds. *See id.* Part 1046 App. A, at (F)(1). An extension of time to fulfill this annual requirement of not more than six months could be obtained on account of a physician-certified medical condition. *See id.* Part 1046 App. A, at (G)(2).

 Plaintiff Gregory P. Jones, at the time of his termination on May 4, 1992, was employed as a lieutenant and firearms range instructor in the Laboratory's Police Group. Plaintiff's Ex. 8. Plaintiff had commenced his employment with the Lab on December 29, 1986, initially holding the position of patrol officer.[2] Tr. 37 (testimony of Jones). Before working for the Lab, he had been employed as a police officer for the New York City Transit Authority until his resignation therefrom on October 7, 1986. Tr. 103 (testimony of Jones).[3]

Jones greatly enjoyed working for the Laboratory's Police Group, Tr. 96 (testimony of Jones), and at all times prior to April 1992

had performed satisfactorily. Tr. 437 (testimony of Goode). Less than two years after Jones began working for the Lab as a patrol officer, he was promoted to the rank of lieutenant, and shortly thereafter was recommended for promotion to the position of captain.[4] Tr. 39, 56 (testimony of Jones), 436–37 (testimony of Goode). In addition, Jones received a number of commendations and letters of appreciation with respect to his police work. Tr. 43–47 (testimony of Jones), 439 (testimony of Goode), Plaintiff's Exs. 2a–d. Further, the last performance review of Lieutenant Jones, covering the period of June 1991 to December 1991, regarded plaintiff's performance to be substantially above average. Plaintiff's Ex. 3, Tr. 49–54 (testimony of Jones). This evaluation, which covered a period ending more than one year *after* Jones contracted Lyme disease, was signed and acknowledged by Inspector Berretta, and Captain Gwathney, Jones' direct supervisor. Plaintiff's Ex. 3, Tr. 627–29 (testimony of Berretta).

As a police lieutenant, Jones was required to carry a .38 caliber handgun and a .9mm submachine gun while on duty. Plaintiff su-

---

2. In his application for employment with the Laboratory, dated July 15, 1986, Jones omitted reference to two prior employers by whom he had been employed. Tr. 110–14 (testimony of Jones). Jones testified that he was unaware of these omissions because his wife prepared the application for his signature, and he signed it without reviewing its content. *Id.* Jones made similar omissions in a separate application that he submitted, in November 1989, for a promotion to the position of captain with the Police Group. Defendants' Ex. OO, Tr. 110–14 (testimony of Jones). Jones likewise attributes these omissions to errors made by his wife in completing the relevant paperwork for his signature. Tr. 110–14 (testimony of Jones).

3. The resume attached to plaintiff's application for promotion to captain, which Jones submitted in November 1989, also incorrectly states that plaintiff was employed as a transit police officer for the New York City Police Department until December 1986. Defendants' Ex. OO, at 3. This error, as was the case with the misrepresentations discussed *supra* in footnote 2, was not discovered by the Laboratory until after the plaintiff commenced this lawsuit. These misrepresentations, therefore, did not enter into the Laboratory's decision to terminate the plaintiff's employment, but rather constitute "after-acquired evidence," that is, "evidence of employee miscon-

duct uncovered by employers during the suit's discovery phase." Gian Brown, Note, *Employee Misconduct and the Affirmative Defense of "After-Acquired Evidence"*, 62 Fordham L.Rev. 381, 381–82 (1993) (analyzing the various approaches used by courts in their treatment of after-acquired evidence in suits brought under Title VII of the Civil Rights Act of 1964, as amended).

In the case at bar, no testimony was provided to show that the Laboratory in fact would have fired the plaintiff had these misrepresentations been discovered during the course of his employment. The only evidence presented in this regard was the employment application itself, which contained a specific certification whereby the plaintiff attested that said application was "complete and accurate." Defendants' Ex. MM, at 4. The application further provided that any false statement "*may* be cause for . . . dismissal after employment." *Id.* (emphasis added). Defendants therefore fail to establish the materiality of these misrepresentations, other than for the Court's consideration of plaintiff's entitlement to equitable relief, including reinstatement to his former position.

4. The Laboratory ultimately denied Jones' application for promotion to captain. Tr. 57 (testimony of Jones). Said denial occurred before Jones contracted Lyme disease.

pervised a platoon of between thirteen to fifteen patrol officers. Tr. 39 (testimony of Jones). Plaintiff also served as a firearms range instructor, and in this capacity was required to "qualify," as part of a weapon-skills testing procedure, other Police Group personnel, including lieutenants, in their use of Lab-issued firearms at the Laboratory's firing range.

In the summer of 1990, plaintiff began to experience a number of ailments including severe headaches, stiffness of the neck, joint pains in his knees and hips, and a generalized weakness in the grip of his hands. He moreover became easily fatigued. Tr. 60 (testimony of Jones). In September 1990, upon an annual physical-fitness examination conducted by the Laboratory's occupational medicine clinic, these ailments were diagnosed as symptoms of Lyme disease. Tr. 59 (testimony of Jones). Plaintiff first notified the Laboratory and Mr. Reaver that he had contracted this disease by submitting to Reaver a doctor's note, dated October 19, 1990, to this effect. Tr. 124, 208, 217–18 (testimony of Jones), 238 (testimony of Reaver), Plaintiff's Ex. 18.[5]

At the time of this diagnosis, plaintiff was one of the first officers in the Police Group to test positive for Lyme disease. Tr. 591–92 (testimony of Dr. Breitenstein). By the time of Jones' termination in May 1992, approximately nineteen employees in the Laboratory's Police Group (including Mr. Jones) had tested positive for Lyme disease. Tr. 615 (testimony of Inspector Berretta). Further, Inspector Berretta, who held the third-highest position in the Police Group at the time of plaintiff's termination, and ultimately participated in the decision to terminate Jones, testified that he contracted Lyme disease in

1989 and that he never was discriminated against because of this disease. Tr. 616–17. Other than the plaintiff, no witness testified at trial as to any discrimination, in any form, against an employee of the Laboratory or the Police Group because of a handicap or illness.

No evidence was presented to show that plaintiff's contraction of Lyme disease adversely affected his job performance. To the contrary, as earlier discussed, plaintiff's last evaluation before his termination, which covered a period ending more than one year *after* he contracted Lyme disease, regarded plaintiff's performance to be substantially above average. Plaintiff's Ex. 3, Tr. 49–54 (testimony of Jones). Further, plaintiff did not introduce any medical testimony, including any doctors' notes, to show that he was suffering from any symptoms related to Lyme disease at the time of his termination. Indeed, from July 1991 to the date of his termination in May 1992, there is no evidence that Jones told any of his supervisors or the Laboratory doctor that he was suffering from any physical symptoms of Lyme disease. Defendants' Exs. CCCC, EEEE, GGGG.

While plaintiff's contraction of Lyme disease did not affect the performance of his substantive duties, it did affect his ability to fulfill timely the training requirements for his position pursuant to DOE regulations and Laboratory policy. In 1991–1992, 10 C.F.R. § 1046, and the Laboratory's written job description for lieutenants, respectively required all lieutenants annually to pass a physical-fitness test and to attend a tactical Special Response Team II training course ["SRT–TT"]. Tr. 543–44 (testimony of Runge).[6] As earlier discussed, the physical-

---

5. The doctor's note, dated October 19, 1990, provides in pertinent part:

> To whom it may concern:
> This is to certify that Greg Jones was tested for Lymes which was reported positive. Patient has aches and pains, and may return to work, but limited duty is advised for 2 to 3 weeks.

Plaintiff's Ex. 18.

6. The Laboratory's written job description for lieutenants during the relevant time period provides in pertinent part:

1. ***PURPOSE:*** To outline the duties and responsibilities of a [Laboratory] police lieutenant.
2. ***GENERAL:*** The police lieutenant performs first-line supervision of personnel assigned to his/her platoon. Within established procedures, schedules, directs, and coordinates normal protection activities and special assignments.... Meets the "offensive" combative physical fitness requirements of 10 CFR 1046. Satisfactorily completes required DOE Central Training Academy courses, including Special Response Team Training.

Plaintiff's Ex. 1.

fitness test included a one-mile run which had to be completed in less than eight minutes and 30 seconds. Tr. 127 (testimony of Jones), see 10 C.F.R. Part 1046 App. A, at (F)(1) (1992). Under DOE regulations, a maximum extension of six months was permitted to complete the run. See 10 C.F.R. 1046.12(c); Part 1046 App. A., at (G)(2) (1992). No manager in the Police Group had the authority to override these regulations. Tr. 337 (testimony of Reaver), 541 (testimony of Runge).

In October 1990, Jones was scheduled for his annual one-mile run, but was unable to participate because of the onset of Lyme disease. Thereafter, on October 23, 1990, Reaver sent Jones a letter warning him that he had to complete the SRT–II training and the annual run.[7] In this letter, Reaver noted that Jones now had failed to attend the SRT–II training courses on three different occasions—two of which preceded Jones' contraction of Lyme disease.[8] Reaver further informed Jones that the physical-fitness training program could be postponed only for six

months, or until April 10, 1991. According to Reaver, failure to meet this DOE-mandated requirement would result in the termination of his employment.[9] Plaintiff's Ex. 5.[10]

Jones asserts that the foregoing letter threatening termination initiated a pattern of abuse directed against him by Reaver solely because he had Lyme disease. According to Jones, in addition to this written warning of dismissal, Reaver orally threatened him with termination for his failure to complete the physical-fitness training exercises, and for his resisting, in April 1991, to lead a training drill. With respect to these matters, Jones testified at trial as follows:

Q. Why do you believe you were terminated on May 4, 1992?

A. I believe I was terminated because Russel Reaver didn't like the fact that he had a lieutenant under his command with a disability.

Q. What is the basis of your belief?

A. Shortly after being diagnosed with Lyme disease, I was initially—that's when

---

7. This letter provides as follows:

October 23, 1990

Lt. Gregory Jones
Police Group
Safeguards and Security Division
Brookhaven National Laboratory
Upton, NY 11973
Dear Lt. Jones:
A requisite for maintaining the position of lieutenant in the Police Group is attendance at required Central Training Academy courses, to include Security Response Team I and II. You have been scheduled for SRT II three times (September 11–16, 1988; October 23–27, 1989; October 29—November 9, 1990), and each time you have failed to attend.
I have received your doctor's note indicating light duty for 2 to 3 weeks. Based on a determination by the DOE designated physician, you will be scheduled to perform your annual run, which was due October 10, as soon as medically able. You will also be scheduled to attend the next available SRT II CTA course. Under the provisions of 10 CFR 1046, if you do not qualify in the physical fitness standards by November 10, 1990, you must participate in a physical fitness training program and requalify within a maximum of 6 months from your anniversary date. Failure to do so will result in being relieved of security inspector duties and termination of employment. Also, failure to attend, and successfully complete, required CTA courses will result in dismissal from duties as a Police Group lieutenant.

Sincerely,
Russel J. Reaver (signed)
Manager, Police Group
c: A. Berretta
Dr. B. Breitenstein
Capt. J. Goode
W. Hempfling
L. Runge
Plaintiff's Ex. 5.

8. Jones testified that on one occasion he missed the SRT–II training course because of the birth of his child. Tr. 139 (testimony of Jones). Jones also admitted that, as a general proposition, he had a distaste for the SRT–II training program, characterizing it as "a lot of Rambo stuff for a week." Tr. 142 (testimony of Jones).

9. At trial, plaintiff's counsel adduced testimony to show that the Laboratory had acted upon this admonition with respect to at least one other lieutenant who failed to meet the physical training requirements because of a knee injury. Tr. 467 (testimony of Gross).

10. At the time of his termination, Jones was scheduled to attend a SRT–II training program from May 11–15, 1992. He was formally notified of this by a memorandum from Mr. Reaver, dated January 23, 1992. Other than stating "[y]ou will be required to attend," this memorandum did not make any explicit threat of termination. Plaintiff's Ex. 7.

I believe the harassment started from Mr. Reaver as far as attending SRT–II courses, the one-mile run.

It wasn't only just that. You are going. I would be threatened with a job loss, loss of pay if I did not attend. Not only attend, but successfully pass the course, and this went on for a period of two years.

Q. Did Mr. Reaver indicate to you his opinion as to your disease?

A. Yes, he did.

Q. What did he say to you?

A. He said it a few times, and there was one occasion when I was told that there would be a drill during the day and I would be assigned a team leader. I asked Inspector Berretta if I could get out of that due to my Lyme disease, and I didn't know I would be physically capable of staying in a containment, the position, for a number of hours it could be, I don't know if I was physically able at that time. There was a flare-up with the Lyme disease, and he says, I don't know, I don't know, he'd go up and talk with Mr. Reaver.

Mr. Reaver came into the office, shut the door in the lieutenant's office, and looked me in the face and said, I don't give a shit about your disease, your illness, your disability. You are a lieutenant under my command and you are required to do this, and I'm ordering you to do this drill.

I then asked if I could get out of this, I don't feel up to it. He said, I don't care. If you don't do it, you ultimately will be terminated.

Q. Did you perform the drill?

A. Yes, I did.

Q. Did Mr. Reaver say anything else with respect to your Lyme disease?

A. He didn't believe it was a bona fide disease.

Q. Did he actually say that to you?

A. Yes, he did.

Tr. 64–66 (testimony of Jones).

Jones ultimately performed his annual physical run on April 10, 1991. He did so upon receiving a doctor's certification that he was physically capable so to engage. Tr. 135 (testimony of Jones). With respect to this requirement, Jones admits that the Laboratory accommodated his physical illness by postponing his annual run for the maximum allowable period of six months. Tr. 136, 185 (testimony of Jones); *see* 10 C.F.R. § 1046.12(c); Part 1046 App. A, at (G)(2) (1991). Further, the uncontroverted evidence shows that on April 1, 1991, at approximately 3:00 P.M., Reaver called Dr. Breitenstein of the Laboratory's Occupational Medicine Division to inform him that Jones would be "processed for termination" if plaintiff was unable to complete his physical fitness test by April 10, 1991. In this phone call, Reaver asked Dr. Breitenstein to reevaluate Jones medically on April 10, 1991 at 9:00 A.M. Defendants' Ex. EEEE (log entry "1 APR 91—3 PM"); Tr. 576 (testimony of Dr. Breitenstein). Shortly thereafter, Dr. Breitenstein received a phone call from Mr. Jones, wherein the aforementioned appointment time was confirmed. In this phone call, Breitenstein advised Jones to check with the personnel department and the Laboratory's legal counsel regarding his employment status. Defendants' Ex. EEEE (log entry "1 APR 91—3:15 PM"); Tr. 576–77 (testimony of Dr. Breitenstein). There is no evidence that Jones made any such inquiry.

Jones also successfully lead the training drill on April 22, 1991. With respect to this matter, it is undisputed that on the day of the drill, Jones was certified by the Laboratory's Occupational Medicine Clinic as medically fit for all routine duties. Defendants' Ex. SS, at D001056. This medical certification slip indicated that plaintiff only needed to avoid excessive use of his upper extremities. *Id.* No evidence was presented to show that Mr. Jones' duties with respect to the drill required any such use.

In addition to the foregoing, on a number of occasions Reaver required Jones, without any advance notice, to stay over after Jones' 11:00 P.M. to 7:00 A.M. shift to meet with Reaver at 8:30 in the morning when Reaver arrived at work. Tr. 71–72, 143–44 (testimony of Jones), 441 (testimony of Goode). Jones complained to William Hempfling, the labor relations manager, about this treatment. Tr. 72 (testimony of Jones), 663 (testi-

mony of Hempfling). Jones testified at trial that after working the "midnight shift," he found it difficult to stay over without prior notice because he would be fatigued, and often failed to bring medication to work. Tr. 71–72 (testimony of Jones).[11]

Jones' assertion that he was singled out to stay over after his shift because he had Lyme disease is contradicted by his own testimony. Jones admits that the only time he formally complained about being asked to stay over was in May 1990, *before* he contracted Lyme disease, when he complained to Mr. Hempfling that his child-care arrangements rendered Reaver's requests problematic. Tr. 145–46 (testimony of Jones), 664 (testimony of Hempfling). Further, Jones made no claim that he mentioned his Lyme disease to Mr. Hempfling, *see* Tr. 146 (testimony of Jones), and Hempfling testified unequivocally that Mr. Jones never mentioned his Lyme disease to him. Tr. 664–65 (testimony of Hempfling).

Plaintiff presented no evidence of any confrontation between himself and Reaver during the approximately nine-and-one-half-month period commencing in July 1991 and ending on April 20, 1992.[12] The only communication between the two during this period that was introduced into evidence consisted of Reaver's written notification to Jones, dated January 23, 1992, informing the plaintiff that he was "required" to attend the SRT–II training course given at Oak Ridge National Laboratory on May 11, 1992.[13] Jones did *not* indicate to anyone at the Laboratory that he would be unable to attend this course, on account of Lyme disease, or for any other reason. Plaintiff's Ex. 7; Tr. 70–71 (testimony of Jones). In addition, as earlier noted, there is *no* evidence that Jones, after June 30, 1991, told any of his supervisors or treating physician that he continued to suffer from any physical symptoms of Lyme disease.

## SPECIFIC INCIDENTS PRECEDING PLAINTIFF'S TERMINATION

This period without confrontation came to a halt with the events beginning shortly before midnight on April 20, 1992. Prior to April 20, 1992, Lieutenant Michael Timm, an officer on an earlier shift, had requested that Lt. Jones qualify him on a .9mm sub-machine gun and a .38 caliber handgun, pursuant to Jones' duties as a range instructor. Tr. 76–77 (testimony of Jones); 384–85 (testimony of Timm). At approximately 11:30 P.M. on April 20, 1992, the weather conditions were damp and misty. Nevertheless, Lt. Timm insisted on qualifying at that time,[14] despite Jones' suggestion that another night would be better. Tr. 76–77 (testimony of Jones), 389 (testimony of Timm).

The two lieutenants left the armory together; Lt. Timm carried the ammunition and placed it in a van for transport to the shooting range. Tr. 77 (testimony of Jones),

11. Reaver testified that he routinely asked at least three other officers besides Jones to stay over to meet with him during his working hours. Tr. 358 (testimony of Reaver).

12. By letter dated June 6, 1991, Larry Runge, the Division Manager, advised Jones that, based upon his failure to complete the SRT–II training, he would withhold the growth component of Jones' scheduled salary increase effective October 1, 1991. Plaintiff's Ex. 6; Tr. 545 (testimony of Runge). The growth component ultimately was *not* withheld from Jones' October 1991 raise. Runge testified that the growth component was allowed because the SRT–II training class that Jones subsequently was scheduled to attend was cancelled by the Central Training Academy, through no fault of the plaintiff. Tr. 545 (testimony of Runge).

13. This memorandum provides as follows:

> Date: January 23, 1992
> To: Lt. Jones
> From: R. Reaver
> Subject: SRT–2
> We have received a slot from the Oak Ridge National Laboratory's Central Training Facility for SRT–2 to be held May 11–15, 1992. You will be required to attend. Take this into consideration when making your vacation schedule.
> Travel arrangements should be made after confirmation documents arrive sometime in late Feb. or early March.
> Plaintiff's Ex. 7.

14. Lt. Timm testified that he asked Jones to qualify him at this time because he didn't feel comfortable asking his direct supervisor, and because his time frame to qualify was nearing its end in light of a scheduled training course, and a planned vacation. Tr. 386–89 (testimony of Timm).

391 (testimony of Timm).[15] No more than eight boxes, or approximately 400 rounds of ammunition, was required to complete Lt. Timm's qualification. Tr. 148 (testimony of Jones). At the firing range, Lt. Timm was qualified on his MP–5, a .9 mm machine gun, and his .38 caliber handgun. Tr. 77 (testimony of Jones).[16]

According to Jones, when the two lieutenants returned to the armory, the plaintiff noticed that the ammunition cabinet was missing rounds of ammunition. Tr. 79 (testimony of Jones). After Lt. Timm returned upon changing his clothes, Jones told him that he was adjusting the count on the log to match the rounds in the cabinet. Tr. 79–80 (testimony of Jones).[17]

In addition to making a false entry in the armory's ammunition log to reconcile the amount of ammunition withdrawn to equal the inventory on hand, Tr. 84, 93, 153 (testimony of Jones), Jones also prepared a separate training information form reporting that Lieutenant Timm expended 742 rounds of ammunition during his qualification. At plaintiff's request, Timm initialed this training form in Jones' presence. Tr. 80 (testimony of Jones), 397–98 (testimony of Timm).

Rather than setting forth an aggregate amount of ammunition expended, the training form specifically reports the amount of ammunition expended by the shooter in seven separate firearms-qualification courses. Plaintiff's Ex. 10. At no place does the number "742" appear on this form; rather, this number is the aggregate of seven separate entries that report the amount of ammunition purportedly expended in each course. Indeed, rather than indicating a passive act of writing down a single number as a "plug"

to reconcile the ammunition withdrawn to the remaining inventory on hand, the relative complexity of adding seven numbers [18] suggests a substantial effort by Jones to persuade a person examining the training form to believe that 742 rounds of ammunition in fact were expended.

At trial, Jones presented evidence to show that, during the time period in question, it was common for the range instructors to make false entries in the *ammunition log* to reconcile the amount of ammunition *withdrawn* from the armory to the amount of ammunition on hand in the inventory cabinet. Tr. 648–50 (testimony of Berretta); Plaintiff's Ex. 19a (memorandum from G.M. Gross to R.J. Reaver, dated April 27, 1992, concerning service ammunition audit). Other than Jones, the Laboratory did not terminate, or discipline in any manner, any range instructor for making a false entry in the ammunition log. Tr. 278 (testimony of Reaver). In addition, some evidence was introduced to suggest that the range instructors often prepared the training forms inaccurately. Plaintiff's Ex. 19a.

During the morning following his firearms qualification, Lt. Timm contacted Mr. Reaver and requested an off-site meeting with him at a nearby restaurant. Tr. 401–03, 417–18 (testimony of Timm). Subsequent to this meeting, on April 23, 1992, Timm's next scheduled work day, Timm provided Reaver with a recorded statement of his version of the events that transpired shortly before midnight on April 20, 1992 and into the early morning hours of April 21, 1992. In this recording, Timm stated that upon returning to the armory after having completed his firearms qualification, Jones pointed to two figures on an otherwise blank piece of paper

**15.** Lt. Timm testified that the box of ammunition was "heavy," and estimated that there were approximately 15 boxes or 750 rounds of ammunition in the cardboard box. Tr. 413 (testimony of Timm).

**16.** Lieutenant Timm testified that upon completing his firearms qualification, he carried the remaining ammunition from the firing range to the van. Timm further testified that the box was still heavy, and estimated that about ten boxes, or approximately 500 rounds of ammunition, remained in the cardboard box he was carrying. Tr. 394, 414 (testimony of Timm).

**17.** Lieutenant Timm testified that Jones presented him with a scrap piece of paper containing numbers, and that Jones told Timm, "Mike, if anyone asks you, this is what you shot with the MP–5 and your .38." Tr. 397 (testimony of Timm).

**18.** The seven entries totalling 742 rounds of ammunition expended were 120, 106, 342, 60, 24, 60 and 30. Plaintiff's Ex. 10.

and told him that, in the event that anyone asked, these numbers represented the amount of rounds of ammunition that Timm had shot. Timm further stated that he brought back approximately ten boxes (i.e., about 500 rounds) of ammunition from the range, and that Jones told him that he was going to "put them in the Chevy." Timm moreover stated that he found these events to be strange. Plaintiff's Ex. 20.

During the afternoon of April 22, 1992, Richard Giesler, Manager of the Planning and Audit Group, and Inspector Berretta conducted a routine walk-through of the armory and an informal audit of the armory's ammunition cabinet. Tr. 454 (testimony of Giesler). Giesler testified that no one had instructed him to conduct a walk-through on that particular day, and that it was part of his routine duties to check periodically the armory and the ammunition cabinet. Tr. 453–54 (testimony of Giesler). Giesler questioned the absence of 1,000 rounds of ammunition and the unusually high number of rounds that the log showed to have been expended on the night of April 20, 1992. Giesler quickly determined that Lieutenant Garcia had forgotten to note his removal of 1,000 rounds for a training project that was in progress at that time, and then asked whether anyone knew how many shooters had shot the indicated amount of ammunition on April 20, 1992. Tr. 455 (testimony of Giesler). Mr. Jones overheard Giesler's question and responded that only one shooter expended all 742 rounds of ammunition. Tr. 164 (testimony of Jones), 456–57, 465 (testimony of Giesler).

Jones admitted at trial that he lied to Giesler when he told him that Lt. Timm had shot all of the ammunition:

Q. Do you recall telling Inspector Berretta and Mr. Giesler that Lt. Timm shot up all of the rounds?

A. I vaguely remember Mr. Giesler. I overheard the conversation that he asked me did he shoot all of the ammunition. I said yes.

Q. That was a lie, wasn't it?

A. Yes, it was.

\* \* \* \* \* \*

Q. [Y]ou did tell Mr. Giesler falsely that Lt. Timm had shot up all of the ammunition?

A. Yes.

Q. And that was a lie to Mr. Giesler?

A. Yes.

Tr. 164–66 (testimony of Jones).

On April 24, 1992, at approximately 9:00 A.M., Jones met with Reaver and Inspector Berretta, and told them that Lt. Timm had expended all 742 rounds at the range. At trial, Jones admitted that this too was a lie.

Q. When you told Inspector Berretta and Mr. Reaver at this April 24, 1992 meeting that Lt. Timm had shot up all 742 rounds, that was not a truthful statement, was it?

A. No, it wasn't.

Q. So, on this occasion you lied to two of your superior officers about what happened to the ammunition. Isn't that true?

A. Yes, it is.

Tr. 168 (testimony of Jones). At the end of the meeting, Reaver asked Jones to prepare a written statement providing a chronological description of what had transpired during Timm's qualification. Tr. 91 (testimony of Jones).

Immediately following this meeting, Jones telephoned Lt. Timm. Tr. 171 (testimony of Jones). Jones admitted at trial that he made this call in an attempt to get Lt. Timm to corroborate his story that Timm had shot all 742 rounds of ammunition at the range:

Q. So, you did try to get Lt. Timm to join you in a lie to Brookhaven National Laboratory even after Mr. Reaver started his investigation; isn't that true?

A. Yes.

Tr. 174 (testimony of Jones). Lieutenant Timm testified at trial that he told Jones that he would tell the truth about what happened to the ammunition. Tr. 420 (testimony of Timm).

Thereafter, Jones provided Mr. Reaver with a written statement, dated April 24, 1992, in which he contended that he did not steal any ammunition and did not need it to practice with his privately-owned weapons. In this statement, Jones suggested that he had not been truthful in his prior statements

that 742 rounds of ammunition had been expended at the firing range, admitting that he "tried to get the number of rounds used to reflect the balance of ammo in [the] cabinet." Plaintiff's Ex. 13. In this written statement, Jones made no mention of returning any ammunition to the cabinet or of falsifying Lt. Timm's training log. *See id.*

Upon receiving the aforesaid statement, Reaver told Jones to provide a supplemental statement that complied with his original request for a detailed chronology of the events in question.

In this supplemental statement, dated April 29, 1992, Jones expressly contradicted his prior representations that all of the rounds of ammunition that he signed out were expended at the range. He now stated, for the first time, that he had returned four boxes of ammunition to the yellow cabinet in the armory (approximately 200 rounds). He further stated, again for the first time, that he did not know how many rounds of ammunition were expended at the firing range. This written statement, however, did not contain any explicit admission by Jones that he had falsified Lt. Timm's training form. Plaintiff's Ex. 14.

In late April 1992, a meeting was convened between the managers of the Police Group, senior members of the Laboratory's Personnel Department, and the Laboratory's counsel. Larry Runge (who at that time was the Manager of the Safeguards and Security Division), Mr. Reaver, William Hempfling (the Labor Relations Manager), and Michael Goldman, Esq. (the Laboratory's Counsel) all testified at trial that at this first meeting, it was decided that the investigation would continue, particularly with respect to the maintenance of the inventory logs and the length of time one would require to shoot the number of rounds that Jones claimed to have been expended at the range that night. Tr. 316 (testimony of Reaver), 528–29 (testimony of Goldman), 550 (testimony of Runge), 665–66 (testimony of Hempfling). There is no evidence that Mr. Jones' Lyme disease was mentioned during this meeting. Tr. 316 (testimony of Reaver), 528–30 (testimony of Goldman), 551 (testimony of Runge), 665–66 (testimony of Hempfling).

Subsequent to this meeting, Mr. Berretta and Lieutenant Rossetti conducted a test at the firing range to determine whether it was possible to shoot the number of rounds claimed to have been used by Mr. Jones during the period of time that he admitted being at the range. Tr. 318 (testimony of Reaver). Lt. Rossetti was chosen because he was the fastest shooter in the Police Group. Tr. 640 (testimony of Berretta). The test established that it was not possible for anyone to have expended 742 rounds of ammunition during the period of time that Mr. Jones admitted to having been at the range. Tr. 319 (testimony of Reaver), 641 (testimony of Berretta).

In addition, Mr. Gross, an internal auditor employed by the Laboratory, was directed by Mr. Reaver to conduct an ammunition audit to determine if there was appropriate documentation to explain the ammunition use recorded on the inventory logs. Tr. 470 (testimony of Gross); *see* Plaintiff's Exs. 19a–d. Mr. Gross found that the ammunition sign-out and record-keeping systems were in "poor shape," and contained many inaccurate entries. Tr. 475–77 (testimony of Gross). Both Mr. Runge an Mr. Reaver testified that neither one had any knowledge, prior to Mr. Gross' audit, that there were discrepancies or mathematical errors in the armory's inventory logs. Tr. 551 (testimony of Runge), 697 (testimony of Reaver). Inspector Berretta similarly testified that he had no knowledge of any intentional falsification of the inventory logs, other than Mr. Jones' falsifications, but had admonished lieutenants both orally and in writing to exercise greater care in completing the logs. Tr. 614 (testimony of Berretta).

After the investigation had been completed, a second meeting was held on May 4, 1992 between the same persons who attended the first meeting. The termination of Mr. Jones was first raised at this meeting by Mr. Goldman, the Laboratory's Counsel. Tr. 317 (testimony of Reaver), 529 (testimony of Goldman). There is no evidence that Mr. Jones' Lyme disease, or any symptom thereof, was mentioned at this meeting. Tr. 317 (testimony of Reaver), 530 (testimony of Goldman), 552 (testimony of Runge), 665, 667

(testimony of Hempfling). Indeed, there is no evidence that either Goldman or Hempfling had knowledge of Mr. Jones' Lyme disease until a copy of plaintiff's federal complaint in this action was served upon the defendants.

Each of the participants at this meeting—including those who had no knowledge of Mr. Jones' Lyme disease, and Inspector Berretta, who himself had tested positive for Lyme disease—voted independently to terminate plaintiff's employment with the Laboratory. A termination letter, dated May 4, 1992, was thereafter prepared by Mr. Hempfling for Mr. Reaver's signature. This letter reads in pertinent part:

May 4, 1992

Lieutenant Gregory Jones
Safeguards and Security Division
Building 050
Brookhaven National Laboratory
Upton, New York 11973
Dear Lieutenant Jones:
Subject: Falsification of Records and Hampering an Investigation

On the night of April 21 going into the morning of April 22,[19] you were acting in the capacity of Range Officer; and while in that position, a fairly significant amount of ammunition became unaccounted for. The Management of this Division immediately undertook an investigation in an effort to determine what became of the missing ammunition.

During the course of the investigation, you verbally indicated on two separate occasions that Lieutenant Timm expended the entire 742 rounds of ammunition you drew from the cabinet. In fact, you completed a report for Timm's signature in which you stipulated that the full amount drawn was expended.

You later supplied a written statement in which you indicated that approximately four boxes of ammunition were returned by you to the cabinet. When I pointed out to you that your written statement differed from your previous verbal statements, you indicated that the written statement was the accurate one. I then pointed out to you that the information supplied in your written statement would render inaccurate the reports you filed regarding the ammunition expended and the amount of ammunition returned to storage. Your response to this inaccuracy was that you falsified the report in order to accurately reflect the amount of ammunition on hand.

As a supervisory employee in the Police Group, you are given a high degree of trust. Concomitant with this level of trust, is a requirement that you perform your duties with an equally high degree of integrity. The fact that you saw fit to change your story while this incident was being investigated and then claimed to have filed a false report in order to account for missing ammunition, is very troubling and would indicate a lack of integrity. This is unacceptable behavior to the Laboratory for one in your trusted position.

It is for this reason that you are being terminated, effective immediately. If you should have any questions regarding the continuation of your medical and life insurances, I would ask that you call Marsha Kipperman of the Personnel Division at 282–2871.

Very truly yours,

Russel J. Reaver (signed)
Manager, Police Group

Plaintiff's Ex. 8.

Plaintiff thereafter commenced the instant action on June 8, 1992, alleging violations of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701–796, and the New York State Human Rights Law, N.Y.Exec.Law §§ 290–301. This case was reassigned to this Court from the Honorable Leonard D. Wexler, United States District Judge for the Eastern District of New York, on January 25, 1994.[20] A jury trial resulted in a verdict, on April 15, 1994, in plaintiff's favor in the amount of $320,000. This award was com-

---

**19.** The evidence suggests that the relevant time frame stated in the letter was in error, and that the correct time frame was the night of April 20, 1992 going into the morning of April 21, 1992.

**20.** Judge Wexler, by Memorandum and Order dated May 24, 1993, denied the defendants' motion for summary judgment.

prised of damages (i) for lost wages in the amount of $100,000, (ii) for actual pecuniary losses in the amount of $20,000, and (iii) for emotional distress, under the New York State Human Rights Law count, in the amount of $200,000.

Pending before the Court are the parties' post-trial applications. First, the defendants renew their application at trial, pursuant to Rule 50 of the Federal Rules of Civil Procedure, for judgment as a matter of law. In the alternative, the defendants move for a new trial, pursuant to Fed.R.Civ.P. 59, on the grounds that the jury's verdict is against the weight of the evidence, and contrary to law, and on the ground that the damage award of $320,000 can not be supported as a matter of law. The plaintiff, in turn, cross-moves for an order reinstating him to his former position as a lieutenant with the Police Group, and for attorney's fees in the amount of $98,039.60, pursuant to 29 U.S.C. § 794a.

## DISCUSSION

Defendants Associated Universities, Inc. and Russel J. Reaver move, in their primary application, for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. Defendants set forth several arguments in support of their application, each of which focuses upon the qualitative aspects of the evidence presented at trial. First, defendants argue that there is no genuine dispute that plaintiff was terminated for gross violations of employment duties totally unrelated to his DOE-mandated physical-training job requirements. Second, defendants contend that there is insufficient evidence, as a matter of law, to show that the reasons stated for plaintiff's termination were pretextual. Finally, defendants contend that no reasonable jury, absent confusion, speculation or prejudice, could conclude from all the evidence that the defendants intentionally discriminated against the plaintiff.[21]

## I. Standards Governing Motion for Judgment as a Matter of Law

■■■ Rule 50(a) allows a defendant to bring a motion for judgment as a matter of law at the close of plaintiff's evidence, or at the close of all the evidence. The purpose of this rule is to enable the court to determine whether there is any question of fact to be submitted to the jury, and whether any verdict in favor of the plaintiff would be erroneous as a matter of law. *See* 9 Charles A. Wright et al., Federal Practice and Procedure: Civil § 2521, at 537 (1971 & Supp. 1993). Rule 50 thus "allows the court to take away from the consideration of the jury cases in which the facts are sufficiently clear that the law requires a particular result." *Id.* Where, as in the instant case, a Rule 50(a) motion brought by the defendant at the close of all the evidence has been denied, the Federal Rules of Civil Procedure deem the court "to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." Fed.R.Civ.P. 50(b). As a result of this procedural device, a court's entry of judgment as a matter of law following a jury verdict will not violate the nonmovant's right to a jury trial.[22] *See* Wright et al., *supra,* § 2522, at 539.

■■ The ultimate question for the Court to decide in a Rule 50 motion is whether there exists a "legally sufficient evidentiary basis for a reasonable jury to find" for a party that has been fully heard at trial on an issue. Fed.R.Civ.P. 50(a). "In determining whether the evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. Instead, it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all *reasonable* inferences from the evidence." 9 Wright et al., *supra,* § 2524, at

---

**21.** Defendants also argue that judgment as a matter of law should be granted on the basis of certain after-acquired evidence of misrepresentations in the plaintiff's job application and application for promotion to captain. As earlier discussed, *see supra* footnote 3, defendants failed to present evidence to establish that plaintiff, in fact, would have been terminated had these mis-

representations become known while he was employed by the Laboratory.

**22.** Rule 50(b) also allows a party moving for judgment as a matter of law to request a new trial in the alternative. *See* Fed.R.Civ.P. 50(b).

543–45 (emphasis added); *see Cruz v. Local Union Number 3*, 34 F.3d 1148, 1155 (2d Cir.1994); *Lambert v. Genesee Hosp.*, 10 F.3d 46, 56 (2d Cir.1993) (Judgment as a matter of law "may only be granted where there is 'such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture,' or if the evidence is 'so overwhelming that reasonable and fair minded persons could only have reached the opposite result.' ") (quoting *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir.1992)), *cert. denied*, —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994).

■ In evaluating the sufficiency of the evidence, however, the court does not restrict itself solely to the evidence that supports a nonmovant's case. 9 Wright et al., *supra*, § 2529, at 573. Rather, the court also must consider the evidence favoring the movant to the extent that it is uncontradicted and unimpeached. *See County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1314 (2d Cir.1990) (citing 9 Wright et al., *supra*, § 2529, at 573). Further, as Professors Wright & Miller note:

> The party with the burden of proof does not make an issue for the jury by relying on the hope that the jury will not trust the credibility of the witnesses. If all of the witnesses deny that an event essential to plaintiff's case occurred, he cannot get to the jury simply because the jury might disbelieve these denials. There must be some affirmative evidence that the event occurred.

9 Wright et al., *supra*, § 2527, at 563, S–183 (citing *Martin v. Citibank, N.A.*, 762 F.2d 212, 217 (2d Cir.1985) (Title VII employment-discrimination case)) (other citations omitted).

■ In the last analysis, the message of Rule 50 is that a motion for judgment as a matter of law should be granted where the court determines that (i) "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party" on a particular issue, and (ii) "a favorable finding on that issue" is required in order for the relevant claim to be maintained under the controlling law.[23] Fed.R.Civ. 50(a). Accordingly, with these principles in mind, the Court now turns to examine the controlling law of this case, and the findings that must be made in order for the plaintiff to prevail on his claims.

## II. Analysis of Plaintiff's Employment-Discrimination Claims

■ In the case at bar, plaintiff Gregory P. Jones brings suit under two separate statutes: the Rehabilitation of 1973, as amended, 29 U.S.C. §§ 701–796 [the "Rehabilitation Act"], and section 296(1) of the New York State Executive Law. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Section 296(1) of the New York State Executive Law provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer . . . because of the . . . disability . . . of any individual . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y.Exec.Law § 296(1)(a). The reader will note that, among other things, the federal and state statutes differ insofar as the federal statute, unlike its state counterpart, expressly limits an employer's liability to circumstances where the employer has discriminated "*solely by reason of* [the employee's] disability." 29 U.S.C. § 794(a) (emphasis added). In this regard, the Second Circuit has observed that

---

**23.** A motion for judgment as a matter of law is to be distinguished from a motion for a new trial, which the defendants bring in the alternative under Rule 59 of the Federal Rules of Civil Procedure. In contrast to the rigorous standard applicable to a motion for judgment as a matter of law, wherein the court "has no discretion whatever and considers only the question of law whether there is sufficient evidence to raise a jury issue," "[o]n a motion for new trial the court may consider the credibility of witnesses and the weight of the evidence," and " 'set aside a verdict supported by substantial evidence where in [the court's] opinion it is contrary to the clear weight of the evidence, or is based upon evidence which is false.' " 9 Wright et al., *supra*, § 2531, at 575–76 (quoting *Garrison v. United States*, 62 F.2d 41, 42 (4th Cir.1932)).

"[t]he 'solely by reason of' inquiry is designed to weed out [Rehabilitation Act] claims where an employer can point to conduct or circumstances that are causally unrelated to the plaintiff's handicap." *Teahan v. Metro–North Commuter R.R.*, 951 F.2d 511, 516 (2d Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992). In view of the substantial federal interest that is triggered where a civil action is brought against a federally-funded facility that stores nuclear material, the parties have conceded that for purposes of determining liability in this action, the federal standard of causation exclusively will govern. Tr. 684 (statement of Morelli). This is consistent with the weight of authority within the Second Circuit. *See Conlon v. City of Long Beach,* 676 F.Supp. 1289, 1300 (E.D.N.Y.1987); *see also* Laurence H. Tribe, American Constitutional Law § 6–25, at 481, § 6–26, at 487 (2d ed. 1988) (federal preemption of inconsistent state legislation); *McEniry v. Landi,* 198 A.D.2d 417, 604 N.Y.S.2d 124, 125 (2d Dep't 1993) (employing "solely by reason of" inquiry in action under the New York State Executive Law involving an alleged disability), *leave to appeal granted,* 83 N.Y.2d 754, 612 N.Y.S.2d 108, 634 N.E.2d 604 (1994).[24]

▉▉▉▉ "The plaintiff in a Rehabilitation Act suit bears the initial burden of establishing a *prima facie* case under the Act." *Heilweil v. Mount Sinai Corp.,* 32 F.3d 718, 722 (2d Cir.1994). In order to make out a *prima facie* case of discrimination under the Rehabilitation Act, the plaintiff must establish, by a preponderance of the evidence, that: (1) he is a handicapped person under the Act; (2) he is otherwise qualified to perform his job; (3) he was discharged because of his handicap; and (4) the employer is a recipient of Federal financial assistance. *See id.* Upon plaintiff's establishment of a *prima facie* case, a burden of production shifts to the defendant. The nature of this burden will depend upon whether the employer relies on the plaintiff's disability as the reason for the

adverse employment decision. *See id.* "If the employer asserts a neutral reason, unrelated to plaintiff's handicap, for its employment decision, then its burden is to 'articulate a legitimate non-discriminatory reason for discharging the employee.' " *Id.* (quoting *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224–25 (2d Cir.1994)). Thereupon, the burden will return to the plaintiff to show that the employer's stated reason is really a pretext for discrimination. *See id.* (citing *Gallo,* 22 F.3d at 1224–25). This allocation of the burden of production and order for the presentation of proof is analogous to the scheme established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for suits brought under Title VII of the Civil Rights Act of 1964. If, however, "the employer relies on plaintiff's handicap as the reason for the adverse employment decision, then [the employer's burden of production] is 'to rebut the inference that the handicap was improperly taken into account by going forward with evidence that the handicap is relevant to qualifications for the position.' " *Heilweil,* 32 F.3d at 722 (quoting *Doe v. New York Univ.,* 666 F.2d 761, 776 (2d Cir.1981)). In such event, "[t]he plaintiff bears the ultimate burden of proving by a preponderance of the evidence that she is qualified despite her handicap." *Id.* (citations omitted).

In the instant case, the defendants have disclaimed any reliance on the plaintiff's Lyme disease in terminating the plaintiff's employment. Accordingly, the *McDonnell Douglas* analysis applies to this action. The Supreme Court instructs, however, that the *McDonnell Douglas* framework of shifting burdens is not intended to suggest that trial courts " 'should treat discrimination differently from other ultimate questions of fact.' " *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2756, 125 L.Ed.2d 407 (1993) (quoting *United States Postal*

---

**24.** At trial, the Court instructed the jury that emotional distress damages could be awarded under the New York State Executive Law, although no such recovery is available under the Rehabilitation Act. *Cf.* Tribe, *supra,* § 6–27, at 500 (citing cases where state law providing for

compensatory and punitive damages for tort victims was outside the occupied federal field, and therefore not preempted). In view of the Court's rulings in this Memorandum and Order, the Court has no cause to reevaluate this determination.

*Serv. Bd. v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)).

As the Second Circuit Court of Appeals has noted in suits brought under Title VII, "[i]n reviewing a case after it has been tried, the focus must be on the central issue in the case—whether there has been intentional discrimination against the plaintiff—rather than on each separate step of the *McDonnell* analysis." *Martin v. Citibank, N.A.,* 762 F.2d 212, 217 (2d Cir.1985); *see also Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749 (1993) ("If ... the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant."). In view of the statutory formulation of the Rehabilitation Act, it is apparent that judgment as a matter of law must be granted in favor of the defendant where, among other things, the plaintiff has failed to establish a genuine dispute over whether he was discharged *solely* because of his disability. *See* 29 U.S.C. § 794(a); *Laverpool v. New York City Transit Auth.,* 835 F.Supp. 1440, 1465 (E.D.N.Y.1993) (Granting defendants' motion for judgment as a matter of law dismissing Rehabilitation Act claims on the ground that the plaintiff "failed to present evidence that he was discharged *solely* on the basis of his handicap.") (emphasis in original) (internal citation omitted), *aff'd* 41 F.3d 1501 (2d Cir.1994).

 Turning to the case at bar, the Court has carefully scrutinized the trial record and the exhibits that have been admitted into evidence. Further, in analyzing this evidence, the Court has extended to the plaintiff the benefit of every reasonable inference, and has ignored all contradicted or impeached evidence that otherwise would favor the defendants. The Court concludes that the proof presented at trial fails to provide a legally sufficient evidentiary basis for a rational jury—absent speculation, conjecture, or prejudice—to have found that the plaintiff was discharged solely because of his Lyme disease. Indeed, in light of the evidence adduced at trial—including Jones' admissions in open court to his highly culpable conduct and the absence of any evidence of confrontation between Jones and Reaver during the nine-and-one-half-month period that immediately preceded Jones' firearms qualification of Lt. Timm—the Court is unable to discern *any* causal connection between Jones' Lyme disease and his termination on May 4, 1992. *See Teahan,* 951 F.2d at 516. Accordingly, judgment as a matter of law must be entered in favor of the defendants.

Even when viewed in the light most favorable to the plaintiff, the evidence presented at trial fails to suggest any linkage between (i) Jones' difficulty in meeting his physical-training requirements and refusal to act as a team leader for a training exercise on account of his Lyme disease, and (ii) his termination for falsifying two separate ammunition records and repeatedly changing his story about what happened to the ammunition. While plaintiff argues in his memorandum in opposition to the defendants' motion that he was constantly "threatened" that he would be terminated or would lose pay if he failed to complete his physical-training requirements, among the evidence plaintiff relies most heavily upon is a letter addressed to him by Mr. Reaver, dated October 23, 1990, and a letter addressed to him by Mr. Runge, dated June 6, 1991. The letter dated October 23, 1990, among other things, warns the plaintiff that his employment will be terminated if he fails to fulfill certain requirements imposed by the United States Department of Energy. It is undisputed that this representation is consistent with DOE regulations. The June 6, 1991 letter, meanwhile, states that a portion of Jones' salary raise will be withheld should he fail to complete the SRT–II training program. *See supra* footnote 12. Plaintiff does not dispute that the Laboratory accommodated him with respect to the circumstances discussed in these letters; (i) in the case of the October 1990 letter, by granting him a six-month extension—the maximum allowable under DOE regulations—to complete his one-mile run, and (ii) in the case of the June 1991 letter, by providing him the full amount of his raise. Further, plaintiff does not dispute that he had difficulties with Mr. Reaver even before he contracted Lyme disease. Tr. 145–46 (testimony of Jones); *cf. Hicks,* —— U.S. at ——, 113 S.Ct. at 2749

(Even if the trier of fact disbelieves the reasons put forth by the employer, the intentional discrimination requisite for Title VII liability does not exist where an employee is terminated because a supervisor has a personal vendetta against him, if such conduct does not stem from a statutorily proscribed reason). Moreover, plaintiff can not dispute the level of trust confided to him concomitant to his position as a supervisor in a police force guarding a nuclear facility.

Further, a careful review of the chronology of events indicated by the evidence reveals an absence of confrontation between the parties from July 1, 1991 through April 21, 1992—a period of roughly nine-and-one-half months that immediately preceded Jones' falsifications of the ammunition records. During this same period, there is no evidence to suggest that Jones informed Laboratory personnel that he continued to suffer from the symptoms of Lyme disease. Under DOE regulations, Jones was required to make such disclosure. *See* 10 C.F.R. Part 1046 App. A, at (C)(2)(a) (1992). This period without confrontation was broken by the plaintiff's admitted acts of affirmative misconduct, which in view of the substantial security risks posed by the disappearance of ammunition at a nuclear facility and Jones' constant changes to his story, provided ample grounds for his termination. Indeed, plaintiff's attribution of his termination to Lyme disease seeks nothing less than to foist legal responsibility upon his former employer for his own admitted errors in judgment. To allow plaintiff's award to stand would contravene the clear federal policy of deterring intentional discrimination in the workplace; under the undisputed facts of this case, the jury's verdict, if not overturned, sends the message that an employee can blame his employer for his own affirmative acts of misconduct and plead his disability as an excuse. Such would undermine the remedial scheme that Congress sought to implement through the Rehabilitation Act.

Needless to say, the Court has determined that the jury, in finding for the plaintiff, reached a verdict founded upon confusion, speculation, sympathy and prejudice. The Court notes that plaintiff's counsel, in his closing statement to the jury, made an impassioned plea about the evils of discrimination in the workplace, and the terrible ordeal one faces when forced to endure such prejudice. While counsel's oratorical skills are unquestioned, his closing statement significantly distorted the evidence presented at trial. Most notably, the summation collapsed the chronology of events to conceal the nine-and-one-half-month period without incident that immediately preceded plaintiff's acts of misconduct. In addition, in pointing to the defendants' alleged pretext, counsel failed to differentiate between the comparatively passive act of adjusting the armory's ammunition log to reconcile to the balance on hand, and the affirmative act of entering seven fictitious entries on Lt. Timm's training form. Tr. 746. Further, counsel in his closing argument advanced a conspiracy theory, arguing that Mr. Reaver must have initiated contact to Lt. Timm to plant in him the idea that Jones falsified the ammunition records. Tr. 754. This conspiracy theory, however, lacks any basis in the record, and is contradicted by testimony adduced by plaintiff's counsel on his direct examination of Lt. Timm, which counsel never sought to impeach, through telephone records or otherwise. Tr. 399–402 (testimony of Timm).

Moreover, despite the fact that this is a discrimination case, plaintiff's counsel "turned the tables" to draw upon the prejudices of the jury, describing how the presence of three retired Air Force colonels within the top management of the Police Group (Mr. Runge, Mr. Reaver, and Mr. Giesler) created a rigid military atmosphere that fostered invidious discrimination against any handicapped person within its ranks:

> Within a period of three years almost the entire top management of the security division was replaced with retired Air Force colonels. Gone was the peaceful job security that Lieutenant Jones enjoyed as a police officer back in 1986. In its place was brought the rigid atmosphere of the military mentality. Gone was the police department's intended purpose of serve and protect. In its place was put the military objective of search and destroy.

The new regime wanted good soldiers willing to follow their leaders blindly, irrespective of the personal consequences to themselves. They did not want sick or disabled soldiers. They wanted good soldiers who would further their ultimate mission.

Tr. 735 (plaintiff's summation).

In sum, Jones has failed to present any evidence to suggest a causal link between his contraction of Lyme disease, and his employer's decision to fire him. Rather, the record unequivocally establishes that Mr. Jones was terminated because he repeatedly lied when he was questioned about his admitted falsifications of the ammunition records. It is clear to the Court that the jury's verdict in plaintiff's favor was based upon improper considerations that lacked evidentiary foundation. Accordingly, judgment as a matter of law must be entered in favor of the defendants.

### III. Additional Applications

The Court notes that the defendants, pursuant to Fed.R.Civ.P. 50(b), alternatively request a new trial in the event that their request for judgment as a matter of law is denied. Under Rule 50(c)(1) of the Federal Rules of Civil Procedure, a court is required to rule on this alternative application, stating the grounds therefor, even though it has granted judgment in favor of the moving party.[25] *See* Fed.R.Civ.P. 50(c)(1). This requirement serves to avoid a protraction of litigation in the event that the district court's judgment is reversed on appeal. *See* 9 Wright et al., *supra,* § 2539, at 607–10. Accordingly, the Court conditionally grants the defendants' request for a new trial on the ground that the jury's verdict is contrary to the clear weight of the evidence. *See id.* at 608.

Finally, in view of the Court's rulings in favor of the defendants, and the uncontradicted evidence of plaintiff's affirmative misconduct, plaintiff's cross-motion for reinstatement to his former position of employment is hereby denied. In addition, plaintiff's application for attorney's fees is denied.

### *CONCLUSION*

In accordance with the foregoing, the Court enters the following orders in this action:

(1) The defendants' motion for judgment as a matter of law is GRANTED.

(2) The defendants' alternative application for a new trial in the event of reversal upon appeal is GRANTED.

(3) The plaintiff's cross-motion for reinstatement to his former position of employment is DENIED.

(4) The plaintiff's cross-motion for attorney's fees is DENIED.

SO ORDERED.

---

**25.** Rule 50(c)(1) of the Federal Rules of Civil Procedure provides as follows:

> If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. In case the motion for a new trial has been conditionally denied, the appellee on appeal may assert error in that denial; and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court. Fed.R.Civ.P. 50(c)(1).